BAKER, J.
*471 A jury found defendant Armando Pineda, Jr. (defendant) guilty of second degree murder for shooting the patriarch of a neighboring family, *472 Rogelio Islas (Rogelio).[1] Defendant was 17 years old at the time of the crime, and the Los Angeles *271 County District Attorney directly filed the charge against him in a court of criminal jurisdiction, rather than a juvenile court. Owing to that filing decision and the subsequent repeal of "direct file" procedures effected by Section 4 of the Public Safety and Rehabilitation Act of 2016 (Proposition 57), we must decide an issue pending on our Supreme Court's docket: whether the changes worked by Section 4 apply to defendant because his conviction is not yet final. In the unpublished portion of our opinion, we also consider defendant's additional assignments of error: the trial court abused its discretion by denying his motion to continue the trial, the court should have instructed the jury on third party flight as consciousness of guilt (both defendant and his father fled the scene of the crime, and the defense at trial was that the father was the shooter), and the court should have given defendant's proposed pinpoint instruction on provocation as relevant to voluntary manslaughter.
I. BACKGROUND
A. The Offense Conduct
On several occasions during the two years that preceded Rogelio's killing, members of the Pineda family (i.e., defendant's family) and the Islas family (i.e., Rogelio's family) argued and, at times, engaged in fisticuffs. Both families lived on the same street in Compton (one house apart), and naturally, each family believed it was in the right and the other family was responsible for the ongoing trouble.
On the day defendant shot Rogelio in June 2014,[2] trouble began around 2:30 in the afternoon. Defendant, his girlfriend Katherine Bautista (Bautista), and his sister Connie had plans to visit another of defendant's sisters. They were preparing to leave for the visit in an SUV parked between the Pineda and Islas family homes. Defendant's father, Armando Pineda, Senior (Senior), had arrived home at about the same time, and he drove past Rogelio standing outside his home without incident.
According to Connie and others in the Pineda family, defendant was in the process of putting his child into a car seat in the SUV when Rogelio insulted defendant and both men then began arguing. Connie and Bautista attempted *473 to convince defendant to stop arguing and get in the SUV-physically holding defendant back at one point. While defendant and Rogelio were arguing, Senior came outside.
The only eyewitnesses to what happened next were defendant and members of his family; they would later claim Senior pulled a gun on Rogelio and shot him multiple times. But there were several witnesses not associated with either family who heard what happened.
Oscar Ibarra (Ibarra) lived in the house between the Pineda and Islas homes, and he heard a woman say in a scared voice, "No, Junior. Don't do it," followed by multiple gunshots two or three seconds later. (Because defendant and his father shared the same name, defendant was often called "Junior." Defendant's mother also referred to defendant as "Papa.") Maria Soto, an off-duty police officer who was visiting the home next to the Islas family's house, heard a woman scream "no, poppy, no" in Spanish and then the sound of shots fired.
Another neighbor who lived two houses down from the Islas family home, Gustavo Silva (Silva), heard the gunshots and *272 looked out his window. Seconds later, Silva heard Connie frantically say, "No, Junior. No. You don't do that. Why did you do that?" Silva then saw someone (he could not see who) pushed into a waiting SUV, which then "burned rubber" driving away from the scene. In the meantime, the other neighbor, Ibarra, had seen defendant run toward the SUV. Although Ibarra could not see defendant enter the vehicle, defendant was no longer in the area after the SUV drove off at high speed.
When the SUV raced away, defendant, Senior, and Bautista (and defendant's infant daughter) were inside; Connie was left behind. Silva saw Connie get on her cell phone and heard her say: "Mom, he killed him. He killed him. What do I do?"; and then, "Junior. Junior. Junior. Junior killed him. What do I do?"[3] This, however, was not Connie's own account of the phone call. She said she called her mother a minute or two after the shooting and said, "Mom, my dad just shot the neighbor." Connie's mother remembered the phone call in the same way, i.e., with Connie identifying her father, not defendant, as the killer.
Connie also sent text messages after the shooting, including a 3:02 p.m. message to her then-boyfriend. (The content of that text message was not offered into evidence at trial-a topic we will return to momentarily.)
*474 Connie's boyfriend called her back after receiving the text message and she told him "her dad just shot the neighbor."[4]
Law enforcement investigation following the shooting determined Rogelio had been shot five times, including two shots that were fatal (one to the back of the head and another to the lower back). Initially, Connie, Bautista, and defendant's mother did not tell the police that Senior was the culprit in Rogelio's murder. They advised the police that Senior was the shooter only later, during interviews approximately seven months after the killing.
B. The District Attorney Charges Defendant With Murder, and the Trial Court Denies a Defense Motion to Continue the Trial
At the time of Rogelio's murder, California law allowed prosecutors to file murder charges against a defendant over 16 years old directly in a court of criminal jurisdiction, meaning a court assigned responsibility for adjudicating charges against adult offenders rather than a juvenile court. (Former Welf. & Inst. Code, § 707, subds. (b)(1), (d)(1), added by Stats. 1975, ch. 1266, § 4, as amended by Prop. 21, § 26, approved March 7, 2000.) Using this "direct file" procedure, the Los Angeles County District Attorney in October 2014 charged defendant with Rogelio's murder in a court of criminal jurisdiction.
During the proceedings that ensued, defendant was initially represented by retained counsel. At a court appearance in December 2014, the trial court relieved retained counsel at defendant's request and appointed the public defender to represent defendant. The court advised defendant that his new attorney would need time to get up to speed on the case, and defendant agreed to continue the trial date to allow counsel to do so.
*273 At a pretrial conference in March 2015, the trial court set May 5, 2015, as the trial date. The court also scheduled a discovery compliance hearing on April 2, 2015, and a pretrial conference on April 17, 2015. At the pretrial conference on April 17, 2015, the trial court denied an oral motion by the defense to continue the trial.
Twelve days later, and less than a week before trial, the defense filed a written motion seeking a 14-day continuance of the trial date. The declaration from defense counsel asserted a continuance was warranted for a variety of reasons. Specifically, defense counsel contended (1) he expected to be in trial *475 on another case on the existing trial date, (2) his investigator was attempting to subpoena a "newly found witness" (Connie's former boyfriend who received her text message following the shooting), (3) the defense ballistics and crime reconstruction expert had not yet completed her final report, (4) the defense was attempting to recover the content of the text message Connie sent her boyfriend after Rogelio's shooting, (5) he received "hours more of recorded phone calls ... from the prosecution, and ... [was] still listening to CDs (with recorded witness statements) received from the prosecution during the past month," and (6) he had inherited a felony caseload including multiple " 'life cases,' " which affected his ability to prepare for trial even though he had "committed a great deal of time in attempting to become ready to handle this matter expeditiously."
Regarding the asserted need for more time to try to recover the text message, defense counsel's declaration stated "the defense investigators [ ]who have done extensive work on this case [ ]since the Public Defender's Office was appointed approximately four months ago" had sent Connie and her boyfriend's damaged cell phones to the Computer Crime Institute at Dixie State University (the Dixie State Institute). The declaration explained the phones had been previously sent to another laboratory that had no success in recovering "crucial text messages" and the Dixie State Institute was one of the only labs that could attempt "chip extractions" that might recover the message. Defense counsel declared he left a message with the Dixie State Institute the day before filing the continuance motion to determine when their work would be completed but had not "heard back yet."
The prosecution opposed the defense request to continue the trial date. The prosecution's opposition brief responded to each of the reasons defense counsel raised as grounds for a continuance, including the effort to recover the content of the text message Connie sent after the shooting. The prosecutor explained she had spoken with a Dixie State Institute representative on the same day the defense attorney contacted the institute. The representative told the prosecutor there were no guarantees the chip extraction would be successful but the institute should have an answer by May 1, 2015. As to the asserted defense need for more time to review recordings of jail calls and visits, the prosecution's opposition stated: "As the court is aware[,] on April 2, 2015, the People turned over CDs consisting of jail calls and jail visits. The Court informed the Defendant that the People were monitoring his calls and visits. If the Defendant continues to make calls and receive visits and those are monitored, the prosecution has a continuing obligation to turn over such evidence. As such, this is an ongoing issue that does not serve as a basis for a continuance."
On the morning of trial, the court heard argument on the defense's motion for a 14-day continuance. Defense counsel acknowledged several of the *476 issues he asserted as grounds for a continuance had been resolved and he was "very close to be[ing] *274 ready." But counsel maintained the requested continuance remained necessary because the Dixie State Institute was still working on recovering the text message from Connie to her boyfriend and because "there are hours worth of CD's and calls that I have been trying to get through and there is more to be done on that." As to the text message issue in particular, defense counsel asserted he had learned that morning that Dixie State Institute personnel were not able to extract information from the chip on one of the damaged phones but they were working on the second phone and he expected they would be done with their work 14 days later, on May 19, 2015.
The prosecution persisted in its opposition to the requested continuance, explaining it was not clear why Dixie State Institute personnel needed until May 19 when they previously said they would have an answer by May 1. The prosecution also noted that if a continuance were granted to review the jail calls, the case would never go to trial because defendant continued to make calls and receive visitors, which generated additional recordings that had to be produced.
Having heard from both sides and considered the defense declaration and the prosecution's written opposition, the trial court denied the motion for a continuance and sent the case out for trial.
C. Jury Instructions and the Verdict
Trial proceeded over the course of six days. Defendant put on a substantial defense case, testifying himself and calling his mother, Bautista, Connie, and Connie's former boyfriend (among others) as witnesses.
The defense at trial was not simply that the prosecution had the wrong guy, i.e., that Senior, not defendant, shot Rogelio. Rather, defendant also relied on the testimony at trial to contend he was not guilty of murder even if the jury believed he was the shooter because he shot Rogelio in an objectively reasonable response to long-term provocation (the family feuding), which would make the crime voluntary manslaughter rather than murder.
In aid of this alternative defense, defendant proposed the court give an instruction he formulated concerning "long-term provocation." The instruction stated: "Provocation may be established even though there was not a single incident qualifying as sufficient provocation. Provocation may be established by a long period of minor events culminating in sufficient *477 provocation." The trial court declined to give this proposed pinpoint instruction, reasoning the provocation concept was adequately covered in the instructions the court intended to give.[5]
For its part, the prosecution asked the trial court to instruct the jury that defendant's flight from the scene of the crime was a fact it could use to infer consciousness of guilt. The court agreed, stating it would give CALCRIM No. 372.[6] Defense *275 counsel made no request to modify the flight instruction, nor did he propose the trial court instruct the jury that it could consider Senior's flight from the scene of the crime in the same manner.[7] During closing argument, however, defense counsel argued without objection that Senior's flight from the scene of the murder was evidence of his guilt: "[W]hat father would allow his son to be taken into custody, or at least, not come back? And what-in a situation where [Senior's] just gone, unless he was the killer. It's just common sense."
During its summation, the prosecution urged the jury to convict defendant of first degree murder, i.e., murder that is willful, deliberate, and premeditated. The jury, however, found defendant guilty of second degree murder. The jury also found true personal use of a firearm enhancements that had been alleged in connection with the murder charge. At sentencing, the trial court considered on the record the factors for sentencing a juvenile described in Miller v. Alabama (2012) 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 and its progeny. The court sentenced defendant to an aggregate term of 40 years to life, consisting of 15 years to life for the second degree murder conviction, and a consecutive 25 years to life pursuant to Penal Code section 12022.53, subdivision (d) based on defendant's personal use of a firearm causing Rogelio's death.
Defendant noticed a timely appeal from the judgment of conviction on October 28, 2015. Just over a year later voters approved the Public Safety and *478 Rehabilitation Act of 2016, denominated Proposition 57 (hereinafter, "the Act"), at the November 2016 general election. The Act took effect the next day, November 9, 2016.
II. DISCUSSION
Section 4 of the Act (hereinafter, "Section 4") amended Welfare and Institutions Code section 707 to eliminate former subdivision (d), which gave prosecutors discretion to directly file charges against certain juvenile defendants in a court of criminal jurisdiction. This direct file authority avoided the need to file a petition in juvenile court and then seek judicial approval to transfer the case to a court of criminal jurisdiction. (See generally People v. Vela (2017) 11 Cal.App.5th 68, 73-75, 218 Cal.Rptr.3d 1, review granted July 12, 2017, S242298 ( Vela ).) Had defendant been charged after enactment of Section 4, there is no question he would have been entitled to a fitness hearing in juvenile court, at which a judicial officer would determine whether to transfer his case to a court of criminal jurisdiction in light of five specified statutory criteria, and after reviewing a report prepared by a probation officer. ( Welf. & Inst. Code, § 707, subd. (a) [listing criteria, including the minor's previous delinquent history, whether the minor can be rehabilitated before expiration of juvenile court jurisdiction, and the circumstances and gravity of the offense].) Of course, defendant was charged well before California voters enacted Section 4, so the question for us is whether he is entitled to the benefit of the changes worked by the Act.
Recognizing our Supreme Court will soon have the final word, we hold Section 4 applies to every minor to whom it can *276 constitutionally apply, which includes defendant because his conviction is not yet final. We further hold defendant's remaining arguments for reversal-the denial of his motion to continue the trial and the asserted instructional errors-are meritless. In light of these twin holdings, we conclude the same remedy ordered in Vela is appropriate here: conditional reversal of the judgment with directions to afford defendant the hearing required by Welfare and Institutions Code section 707 (as amended by the Act), if requested by the prosecution.
A. Section 4's Statutory Changes Apply to Defendant and Require a Conditional Reversal of the Judgment
Six published Court of Appeal opinions have endeavored to discern the voters' intent in enacting Section 4, although only five have found it necessary to decide the precise question we confront here: whether Section 4's amendments to the Welfare and Institutions Code apply to juveniles charged or convicted before the section's effective date. ( People v. Superior Court (Walker ) (2017) 12 Cal.App.5th 687, 220 Cal.Rptr.3d 1 ( Walker );
*479 People v. Marquez (2017) 11 Cal.App.5th 816, 217 Cal.Rptr.3d 814 ( Marquez ), review granted July 26, 2017, S242660; Vela , supra , 11 Cal.App.5th 68, 218 Cal.Rptr.3d 1, rev. gr.; People v. Mendoza (2017) 10 Cal.App.5th 327, 216 Cal.Rptr.3d 361, review granted July 12, 2017, S241647 ( Mendoza ); People v. Cervantes (2017) 9 Cal.App.5th 569, 215 Cal.Rptr.3d 174, review granted May 17, 2017, S241323 ( Cervantes ); see also People v. Superior Court (Lara ) (2017) 9 Cal.App.5th 753, 774, 215 Cal.Rptr.3d 456, review granted May 17, 2017, S241231 [finding it unnecessary to consider whether the changes worked by Section 4 amount to a legislative reduction in the punishment for a crime].) Having granted review (so far) of all but one of these cases, our Supreme Court will ultimately resolve the question we must decide. Our discussion of the ramifications of Section 4 for this case will therefore get right to the point.
The weight of published authority concludes Section 4's elimination of direct filing authority does not require reversal for a juvenile convicted before Section 4 took effect-regardless of whether the conviction in question is final. ( Marquez , supra , 11 Cal.App.5th at pp. 820-821, 217 Cal.Rptr.3d 814, rev. gr.; Mendoza , supra , 10 Cal.App.5th at pp. 345, 348, 216 Cal.Rptr.3d 361, rev. gr.; Cervantes , supra , 9 Cal.App.5th at pp. 580, 601-602, 215 Cal.Rptr.3d 174, rev. gr.; see Walker , supra , 12 Cal.App.5th at pp. 697-699, 220 Cal.Rptr.3d 1 ; see also People v. Vieira (2005) 35 Cal.4th 264, 306, 25 Cal.Rptr.3d 337, 106 P.3d 990 ["[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"].) But we exercise judgment not by counting the number of published opinions on either side of an issue but rather by assessing the persuasiveness of the reasons offered for reaching one outcome or another. Without doubt, the question of Section 4's application to convictions that preceded its effective date has spawned reasonable disagreement, but we find the analysis in Vela to be generally the better reasoned approach.
We acknowledge at the outset that the general rule is that legislative changes ordinarily apply only prospectively, " 'absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise.' ( *277 Tapia v. Superior Court (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434] [ ] ( Tapia ) ...)" ( Cervantes , supra , 9 Cal.App.5th at p. 599, 215 Cal.Rptr.3d 174, rev. gr.) It is also true that the text of the Act itself is silent on whether Section 4 should apply to convictions sustained, or charging decisions made, prior to its enactment.[8] (See, e.g., Marquez , supra , 11 Cal.App.5th at p. 822, 217 Cal.Rptr.3d 814, rev. gr.) But the ultimate question we answer in this case (as in every case *480 concerning the proper effect to be given to an initiative) is what did the voters who approved the Act intend. The answer to that question turns, in our view, on a proper application of In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 ( Estrada ); an appreciation of the Act's purposes, which the Act itself lays bare in its uncodified provisions; and an understanding of the differences between juvenile and criminal adjudication. On each of these points, we believe Vela arrives at the correct conclusion.
Estrada stands as an exception to the general rule that legislative changes ordinarily operate prospectively. ( Cervantes , supra , 9 Cal.App.5th at p. 599, 215 Cal.Rptr.3d 174, rev. gr.) As recounted in Vela , Estrada holds that " '[w]hen the Legislature amends a statute so as to lessen the punishment [,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.' " ( Vela , supra , 11 Cal.App.5th at p. 77, 218 Cal.Rptr.3d 1, rev. gr., quoting Estrada , supra , 63 Cal.2d at pp. 744-745, 48 Cal.Rptr. 172, 408 P.2d 948.)
We agree with Vela 's conclusion that the changes in law worked by Section 4 are, for Estrada purposes, amendments that lessen the punishment for crimes committed by juvenile defendants. ( Vela , supra , 11 Cal.App.5th at pp. 77-78, 218 Cal.Rptr.3d 1, rev. gr.) Thus, under the interpretive rule announced in Estrada , we presume the voters who approved the Act intended defendant to benefit from the repeal of the direct filing procedure and the corresponding requirement for a juvenile court fitness hearing because he is among the people to whom those changes may still constitutionally apply. ( Id. at p. 78, 218 Cal.Rptr.3d 1 ["[W]e find an 'inevitable inference' that the electorate 'must have intended' that the potential 'ameliorating benefits' of rehabilitation (rather than punishment), which now extend to every eligible minor, must now also 'apply *278 to every case to which it constitutionally could apply' "].)
The conclusion that Section 4 is properly seen as a measure reducing the punishment for crimes makes sense in light of the markedly reduced emphasis on punishment in juvenile courts, as compared to courts of criminal *481 jurisdiction. Vela details the differences between the two court systems at length. ( Vela , supra , 11 Cal.App.5th at pp. 73-74, 218 Cal.Rptr.3d 1, rev. gr. [quoting the observation in In re Julian R. (2009) 47 Cal.4th 487, 496, 97 Cal.Rptr.3d 790, 213 P.3d 125 that the " '[s]ignificant differences between the juvenile and adult offender laws underscore their different goals: The former seeks to rehabilitate, while the latter seeks to punish' "]; see also Welf. & Inst. Code, § 607 [juvenile court jurisdiction over a juvenile offender extends, at most, to the time at which the offender turns 25 years of age]; Cal. Code Regs., tit. 15, §§ 4951 - 4957 [parole consideration dates for juvenile offenders range from a year or less up to a maximum of seven years, depending on the severity of the offense].)
In addition, the upshot of the Estrada rule-that courts will presume a measure reducing the punishment for an offense applies to all cases in which the punishment may be constitutionally reduced-is consistent with the voters' declared purposes in approving the Act. Those purposes include "[s]top[ping] the revolving door of crime by emphasizing rehabilitation, especially for juveniles"; "[r]equir[ing] a judge, not a prosecutor, to decide whether juveniles should be tried in adult court"; and "[s]av[ing] money by reducing wasteful spending on prisons." (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57, p. 141 [§ 2].) Section 5 of the Act directs that it should be construed broadly to accomplish these purposes, and we agree with Vela that the statements of purpose in the Act further demonstrate that "the intent of the electorate in approving [the Act] was to broaden the number of minors who could potentially stay within the juvenile justice system, with its primary emphasis on rehabilitation rather than punishment." ( Vela , supra , 11 Cal.App.5th at p. 76, 218 Cal.Rptr.3d 1, rev. gr.)
The Vela opinion also rebuts-persuasively so, in our view-the central rationale on which the Cervantes line of cases relies to hold Section 4 does not affect a defendant charged and convicted before the Act took effect. Those cases read our Supreme Court's decision in People v. Brown (2012) 54 Cal.4th 314, 142 Cal.Rptr.3d 824, 278 P.3d 1182 ( Brown ) as having limited the Estrada interpretive rule to applying only where a legislative change reduces the punishment for a particular criminal offense . (See, e.g., Mendoza , supra , 10 Cal.App.5th at p. 348, 216 Cal.Rptr.3d 361, rev. gr.; Cervantes , supra , 9 Cal.App.5th at p. 600, 215 Cal.Rptr.3d 174, rev. gr. ["[L]ater Supreme Court cases have limited Estrada 's retroactivity exception to statutory changes that mitigate the penalty for a particular crime ..."].) They then reason Section 4 does not reduce the penalty for a particular crime, even though juvenile courts cannot order offenders to be held in custody as long as courts of criminal jurisdiction can, because Section 4's amendments provide only an uncertain benefit, namely, a fitness hearing that might or might not result in the transfer of a juvenile offender to a court of criminal jurisdiction. (See, e.g., *482 Marquez , supra , 11 Cal.App.5th at pp. 826-827, 217 Cal.Rptr.3d 814, rev. gr.; Mendoza , at p. 348, 216 Cal.Rptr.3d 361 ["We acknowledge that the amendments [made by Section 4] may have the effect of reducing the punishment in some cases because, unlike adult court sentences, the longest that juvenile court jurisdiction generally *279 extends is until the juvenile offender is 25 years old. [Citation.] But, as the Brown court reasoned ..., the Estrada rule is not applicable to any amendment that may reduce a punishment"]; Cervantes , at pp. 601-602, 215 Cal.Rptr.3d 174.)
Vela , however, cites authority-including People v. Francis (1969) 71 Cal.2d 66, 75 Cal.Rptr. 199, 450 P.2d 591 ( Francis ) and Estrada itself-that holds a contingent reduction in penalty (meaning a reduction that may or may not actually take place, depending on the exercise of discretion) still warrants invocation of the presumption that the change in law was intended to apply as broadly as constitutional principles permit. ( Vela , supra , 11 Cal.App.5th at pp. 78-80, 218 Cal.Rptr.3d 1, rev. gr.) Francis , in particular, is key. In that case, the Legislature changed the statutorily authorized penalty for Francis's marijuana possession crime while his case was on appeal, making the crime a "wobbler" rather than a straight felony. ( Francis , at p. 75, 75 Cal.Rptr. 199, 450 P.2d 591.) Our Supreme Court acknowledged Francis's case was somewhat unlike Estrada because the change did not "revoke one penalty and provide for a lesser one but rather vest[ed] in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." ( Id. at p. 76, 75 Cal.Rptr. 199, 450 P.2d 591.) But our Supreme Court held the " 'inevitable inference' " drawn in Estrada , i.e., that the Legislature intended the amendment to apply to every case to which it could constitutionally apply, applied equally in Francis's case because the legislative change was a determination "that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (Ibid. (emphasis added); see also Vela , at pp. 79-80, 218 Cal.Rptr.3d 1.)
The same analysis obtains with respect to Section 4: the voters who approved the Act determined criminal punishment for juvenile offenders may be too severe in some cases, namely, those where a judge declines to order the transfer of an offender to a court of criminal jurisdiction-an adjudicatory forum in which there is a greater focus on punishment instead of rehabilitation and greater latitude to impose substantially longer custodial sentences. In other words, the holding in Francis , especially when combined with what Vela describes as the "sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders" ( Vela , supra , 11 Cal.App.5th at p. 75, 218 Cal.Rptr.3d 1, rev. gr.), convinces us California voters intended Section 4's amendments to then-existing law to apply to all juveniles possible, *483 including defendant, because punishing those juveniles with criminal court sentences might in some cases be too severe.[9] *280 Having held defendant is entitled to the benefit of Section 4's amendments to section 707 of the Welfare and Institutions Code, reversal of the judgment is required because defendant has not had the fitness hearing that section requires, if requested. The question remains, however, what form the reversal should take. We agree with Vela that a conditional reversal of the judgment is the remedy that best gives effect to the voters' intentions in passing the Act.[10] ( Vela , supra , 11 Cal.App.5th at pp. 81-82, 218 Cal.Rptr.3d 1, rev. gr.) But a conditional reversal is only appropriate in this case if the reversal is necessary solely to give effect to our holding with respect to the ramifications of the Act's passage. We therefore proceed to discuss defendant's other assertions of error and conclude a conditional reversal is indeed the appropriate remedy because all of defendant's remaining arguments for outright reversal lack merit.
B.-D.**
DISPOSITION
The judgment is conditionally reversed. The cause is remanded to the juvenile court with directions to conduct a fitness hearing under *484 Welfare and Institutions Code section 707, if the prosecution moves for such a hearing, no later than 90 days from the date the remittitur issues. If, after a fitness hearing, the juvenile court determines that it would have transferred defendant to a court of criminal jurisdiction, the judgment of conviction shall be reinstated as of the date of that determination. If no motion for a fitness hearing is filed, or if a fitness hearing is held and the juvenile court determines that it would not have transferred defendant to a court of criminal jurisdiction, defendant's criminal conviction, including the true findings on the alleged enhancements, will be deemed to be juvenile adjudications as of the date of the juvenile court's determination. In the event the conviction is deemed a juvenile adjudication, the juvenile court shall then conduct a dispositional hearing and impose an appropriate disposition within the court's discretion.
I concur:
DUNNING, J.*

Many of the individuals involved in this case share the same last name. We use first names where warranted for clarity.

Defendant does not challenge the sufficiency of the evidence to support the jury's verdict, and we state the facts in the light most favorable to the People. (People v. Perez (2010) 50 Cal.4th 222, 229, 112 Cal.Rptr.3d 310, 234 P.3d 557 ; People v. Cooper (1979) 94 Cal.App.3d 672, 676, fn. 2, 156 Cal.Rptr. 646.)

Ibarra also saw Connie talking on her cell phone, but he could not hear what she was saying. Ibarra later asked Connie what happened and she said, while crying, "He shot" and "He had a gun."

According to defendant's mother, Senior picked her up in the SUV after fleeing the scene of the crime (by then, no one else was in the vehicle) and he admitted shooting Rogelio. When asked later during trial, the Pineda family witnesses testified they had not seen or heard from Senior after the day of the shooting.

The court instructed the jury with CALCRIM Nos. 522 and 570. CALCRIM No. 522 advised the jury that provocation may reduce a murder from first degree to second degree, or to manslaughter, and that the "weight and significance of the provocation, if any, are for you to decide." CALCRIM No. 570 informed the jury that it could find defendant guilty of voluntary manslaughter if he killed in response to provocation that would cause an average person to act rashly from passion rather than judgment. As relevant here, the instruction stated "[s]ufficient provocation may occur over a short or long period of time."

As given, CALCRIM No. 372 stated: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant's attorney objected to the CALCRIM No. 372 instruction, but only on the ground that defendant turned himself in to the police four days after Rogelio's murder. In defendant's view, this meant he had not fled.

Because the Act includes no express provision declaring whether it applies prospectively or retrospectively, the question of the voters' intent must be resolved by reference to background legal principles. Put more concretely, voters were not told Section 4 would apply retrospectively, but neither were they told it would apply only prospectively; the choice between the two modes of application necessarily turns on the correct application of settled, judicially developed interpretive principles. (See, e.g., People v. Burton (1989) 48 Cal.3d 843, 861, 258 Cal.Rptr. 184, 771 P.2d 1270 ; People v. Weidert (1985) 39 Cal.3d 836, 844, 218 Cal.Rptr. 57, 705 P.2d 380 ["The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted"]; see also People v. Valencia (2017) 3 Cal.5th 347, 379, 220 Cal.Rptr.3d 230, 397 P.3d 936 (conc. opn. of Kruger, J.) ["California cases have established a set of standard rules for the construction of voter initiatives. 'We interpret voter initiatives using the same principles that govern construction of legislative enactments.' [Citation.]"].) In this vein, we further note there is no support for the proposition that the intentions or expectations of voters who passed an earlier, unrelated initiative measure should control the interpretation of an initiative measure enacted by a differently composed electorate years later.

To the extent the Cervantes line of cases can be read to suggest the Estrada /Francis rule applies only where the legislative change enumerates a specific penal statute (as with Health and Safety Code section 11530 that was at issue in Francis ), we think the suggestion unjustifiably elevates form over substance. If California voters approved an amendment to Penal Code section 190 that stated any person guilty of murder in the first or second degree, who was 17 years old at the time of the crime, could be sentenced to a maximum of eight years in prison, we (and presumably other courts) would have no difficulty concluding the amendment would apply to all convictions not yet final. Nor would we have any difficulty reaching the same conclusion if California voters made similar amendments to multiple penal statutes all in the same initiative measure. Section 4, in substance, is no different-it provides for analogous, albeit contingent, reductions in punishment for a host of penal statutes without need of going to the trouble of enumerating them all.

Because we reverse the judgment, albeit conditionally, there is no concern that it is impossible to comply with the terms of Section 4. For one thing, the prosecution theoretically could opt not to file a motion for a fitness hearing, in which case there would obviously be no concern that such a motion was not "made prior to the attachment of jeopardy." (Welf. & Inst. Code, § 707, subd. (a)(1).) But even understanding a fitness hearing motion is likely a foregone conclusion here, there is still no reason to believe complying with the terms of Section 4 is impossible. Reversal of the judgment effectively operates to vitiate the prior attachment of jeopardy-as even Cervantes appears to recognize. (People v. Eroshevich (2014) 60 Cal.4th 583, 590-591, 179 Cal.Rptr.3d 356, 336 P.3d 678 ; Cervantes, supra, 9 Cal.App.5th at p. 608, 215 Cal.Rptr.3d 174, rev. gr. ["Under a waiver theory, jeopardy apparently does reattach with the swearing of a second jury on remand ..."], emphasis added.)

See footnote *, ante.

Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Parts II.B-II.D; Justice Kriegler's concurring and dissenting opinion is certified for publication in full.