Filed 2/22/18

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C078999 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF13-2418) |
| v. | |
| DANIEL WILLIAM MARSH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, David W. Reed, Judge. Conditionally reversed and remanded with directions.

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of the Factual and Procedural Background and part 2.0 of the Discussion.

1

In September 2014, a jury found defendant Daniel William Marsh (born in May 1997) guilty of two counts of first degree murder committed in April 2013 (finding that he personally used a deadly weapon in each instance) and sustained allegations of three special circumstances. It subsequently found defendant was sane at the time of the offenses. After making an individualized assessment of the appropriateness of the sentence for defendant, the trial court imposed an indeterminate life sentence with a minimum term of 52 years. The case was not fully briefed until July 2017.

On appeal, defendant argues that *Miller v. Alabama* (2012) 567 U.S. 460 [183 L.Ed.2d 407] (*Miller*) and *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1] (*Roper*)—which respectively prohibit the *mandatory* punishment of life without parole for minors for any offense, or the death penalty under *any* circumstances even for minors who commit homicide—both apply in the context of a sanity determination, with the result that the holdings require the resurrection of the doctrine abrogated under California law in which an "irresistible impulse" test is applied to determine a defendant's sanity (measuring the ability to conform one's behavior to the requirements of the law).[1] Therefore, defendant asserts that the sanity phase must be reversed and retried with instructions on this rejected standard. We reject this argument in the published portion of the opinion. Given the length of time it took to complete briefing in this matter, defendant also filed a supplemental brief seeking the application of a 2016 initiative amendment to his case because it is still not final, under which prosecutors are stripped of

---

[1] *People v. Drew* (1978) 22 Cal.3d 333, 345 adopted this standard for determining sanity as a matter of judicial fiat, overruling long-standing criticism of this standard as removing the deterrence of punishment for those who otherwise were aware of the wrongfulness of a criminal act (e.g., *People v. Hubert* (1897) 119 Cal. 216, 221, 223). The electorate promptly abrogated *Drew* in 1982, enacting Penal Code section 25 to reinstate the traditional test of insanity under which a jury must find that a defendant either was not aware of the nature of the act committed *or* was not aware that the act was wrong. (*People v. Horn* (1984) 158 Cal.App.3d 1014, 1021, 1024-1027, 1031-1032.)

their power to file charges against minors directly in criminal court without judicial intervention.  The People concede that this initiative applies retroactively to defendant's pending appeal, and that we must conditionally reverse for proceeding in juvenile court.

Given the nature of defendant's appellate claims, we are not concerned with the evidence underlying his "extraordinarily heinous" offenses (to quote the trial court at sentencing).  It is also clear defendant has deeply disturbed mental functioning, although that does not of itself align with the criteria absolving a defendant on the ground of insanity; for example, see the facts in our opinion in *People v. Bobo* (1990) 229 Cal.App.3d 1417, in which a jury found the defendant sane (though our analysis of the sufficiency of the evidence to support that determination was not part of the published section of the opinion).  However, as we are not called upon to review the sufficiency of the evidence to support the jury's sanity finding in the present case, we do not need to also relate the entirety of this evidence.  We thus omit the underlying facts from the published portion of the opinion, other than to note the teenaged defendant (one month shy of his 16th birthday) stalked a Davis neighborhood at night and randomly selected the home of the two victims to satisfy a long-standing (and oft-expressed) desire to kill, after which he mutilated their bodies.

## FACTUAL AND PROCEDURAL BACKGROUND[*]

In 2008, defendant's parents underwent a contentious divorce when his mother began an affair with another woman, who had been defendant's kindergarten teacher. Defendant shuffled back and forth between the parents' households until his father threw him out of his house at age 14 for coming home constantly drunk and under the influence of marijuana (after which point defendant rarely saw his father); his mother was oblivious to his substance abuse in her house.  Defendant, being of small stature, was the subject of

---

[*]  See footnote, *ante*, page 1.

3

bullying at school (as was his close friend, though the friend did not think the degree was that significant).

The parties both detail defendant's extensive interaction with the mental health system from age 11 onward, the particulars of which we do not need to relate. We thus accept their mutually agreed statements of facts (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 3) that defendant received "virtually continuous . . . counseling and treatment" for depression, anger issues, and anorexia (along with various medications), including two rounds of in-patient hospital care (the second in 2012-2013 occasioned by defendant's suicidal and homicidal thoughts). This course of treatment was ongoing at the time of the murders; none of the professionals who treated defendant over the years apparently discerned the presence of any threat to the community.

Defendant's private interactions are more telling. From seventh grade on, he shared his preoccupation with violence with his intimates, starting with a desire to kill his mother's girlfriend for ruining his parents' marriage. Beginning in 2012, he became preoccupied with a deviant Web site that promoted amateur videos of actual gory events, "really fucked up stuff." He and his intimates shared an interest in serial killers such as Ted Bundy and Jeffrey Dahmer, and his physical relationship with his girlfriend included consensual violent elements, such as choking. Defendant began to talk more persistently with friends about torture and killing random people, seeming to become more vicious and drawing graphically violent pictures of killings with morbid details of the methods. Defendant additionally had the hallmark sociopathic trait of animal cruelty, which his medications helped suppress.

The victims were an octogenarian husband and his septuagenarian wife, who lived in south Davis; the husband was still practicing law and performing in an amateur singing group, and the wife was a retiree active in her church. Neither the husband nor his wife appeared for performances scheduled on the weekend of April 13 and 14, 2013, which

4

was uncharacteristic for them. The manager contacted the wife's daughter on Sunday evening, who was unable to reach either her mother or stepfather. She was unable to gain entry or see clearly into the darkened residence, so she called the police. The police were able to discern the bodies of the victims through a window with a flashlight, and forced entry.

Once again, we are not compelled to relate the grisly details of the condition of the victims' bodies, so we accept the mutually agreed summaries in the statements of facts of the parties. Each victim had more than 60 stab wounds (including exit wounds). These were inflicted all over their heads and bodies, with a multitude of stabbings to their abdomens becoming interconnected complex wounds. A glass tumbler was found in the husband's abdominal cavity, and a cell phone in the wife's.

Defendant had told a close friend on April 14 that he had committed the murders; the close friend did not want to hear about it. On the following day, defendant again told his close friend and others at lunch that he was in the news. After school, defendant asked his girlfriend if she had heard about the murders. When she said no, he began to describe with pride the details of the manner in which he had killed the couple, smiling and telling her how great it had felt. On the following day, he described his actions to his close friend in greater detail, again smiling and claiming it was the best experience he ever had. The friend and the girlfriend talked with each other about what defendant had told them, but were paralyzed with inaction because they feared defendant.

At some point in June, defendant snuck into the home of his girlfriend late at night through the dog door. She was on the phone with defendant's friend, who then resolved finally to go to the police. On June 17, the police took defendant into custody for questioning. He gave a lengthy statement, which appears in a 165-page transcript as an exhibit.

5

About two and a half hours into the interview, defendant began to confess.  He began with background details (such as his desire at age 11 to kill his mother's girlfriend), and noted his lack of sympathy or empathy for others.  He recounted that on either Friday or Saturday night, he had left his mother's house around 2:00 or 3:00 a.m. with a Buck knife from her bedroom, scouting the south Davis area for a victim who had left a window or door open.  He eventually cut through a screen at the victims' home and let himself in.  He was "nervous but excited and exhilarated."  He began by stabbing the wife, who "wouldn't die," then stabbed the husband in the neck when he woke up (which rendered him incapacitated) before returning to the wife.  After they were both dead, he continued to stab both of them and "messed around with" their bodies, inserting the tumbler and phone into their abdomens "to fuck with the people who had to . . . investigate it," and cutting open the wife's leg to look inside.  He pulled fat out of her leg and torso to examine it.  He also cut open the husband's forehead out of curiosity.  He described the murders as giving him the most enjoyable feeling he had ever experienced (which was heightened while they were still conscious and resisting), better than sex, which lingered for weeks.  He made later expeditions with a baseball bat (so that it would not be associated with the stabbings) to find someone on the street, but did not come across any available victims.

**DISCUSSION**

**1.0    "Irresistible Impulse" Is Not a Constitutionally Mandated Test of Insanity**

In the trial court, defendant argued that due process and the prohibition against disproportionate punishment required the trial court to instruct on irresistible impulse as the standard for sanity of a juvenile.  He contended the same body of research on the development of brain functioning in adolescents that underlay the decisions in *Miller* and *Roper* with respect to punishment should apply equally to the determination of sanity, because this research documents the inability of adolescents to control their behavior.

6

Notably absent from the argument was any authority beyond the effort to analogize to *Miller* and *Roper*. The trial court rejected the analogy and adhered to the statutory test for insanity, instructing the jury accordingly.

Defendant renews the claim on appeal in a scant argument of seven pages following a voluminous summary of the evidence at trial. He acknowledges that due process does not impose any particular definition of sanity on the states (*Clark v. Arizona* (2006) 548 U.S. 735, 752-753 [165 L.Ed.2d 842] [noting "no particular formulation has evolved into a baseline for due process"]), or require the use of irresistible impulse as a measure of sanity (*Leland v. Oregon* (1952) 343 U.S. 790, 801 [96 L.Ed. 1302] ["the progress of science has not reached a point where its learning would compel us to require the states to eliminate the [']right and wrong['] test from their criminal law," and in any event "wide disagreement" regarding basic policy in criminal responsibility means that irresistible impulse as test is not " 'implicit in the concept of ordered liberty' "]). However, he then simply reiterates his argument in the trial court that the decisions in *Miller* and *Roper*, by embracing the science of adolescent mental development as a basis for constitutionally ameliorating the *punishment* of juveniles, also requires the application of this scientific research to *sanity determinations* of juveniles as a matter of due process and the bar against disproportionate punishment, with the consequence that irresistible impulse must be the standard for sanity (adding the straw argument that the evidence at trial warranted use of this standard).

What defendant disregards is the high court's express rejection of the idea that it should play *any* role in formulating a nationwide definition of insanity in constitutional terms, because it is a defense that has "historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law[,] and [the] changing religious, moral, philosophical, and medical views of the nature of [humankind]. *This process of adjustment has always been thought to be the province*

7

*of the States*"; in its view, "[n]othing could be less fruitful" than "formulating a constitutional rule." (*Powell v. Texas* (1968) 392 U.S. 514, 536 [20 L.Ed.2d 1254], italics added (*Powell*).) Given this view, recently echoed in *Clark v. Arizona*, *supra*, 548 U.S. at pages 752 through 753, due process cannot possibly compel the use of irresistible impulse as the test for sanity of juveniles since it is *not* part of any consensus on the elements within the concept of ordered liberty.

As for the constitutional prohibition against disproportionate punishment, *Miller* (the most recent decision in this area of jurisprudence) itself specifies that, "children are constitutionally different from adults *for purposes of sentencing*." (*Miller*, *supra*, 567 U.S. at p. 471, italics added.) Their diminished culpability and greater potential for reformation make them " 'less deserving of the *most severe* punishments' " (*ibid*., italics added), which is not the same thing as saying they are less deserving of *any* punishment. Defendant does not provide even the most narrow of analytic bridges from decisions concerned with the constitutional proportionality of punishment to the insanity defense. As *Powell* explains, the constitutional protection against disproportionate punishment is interested in the nature of the conduct at issue *only* to the extent it supports the method or nature of the penalty imposed for the criminal violation (*Powell*, *supra*, 392 U.S. at pp. 531-532); it does *not* prohibit punishment for conduct *in response to* an irresistible impulse such as addiction to alcohol (public drunkenness being at issue in *Powell*) except to the extent a state would make the status itself of addiction subject to criminal sanctions (as in *Robinson v. California* (1962) 370 U.S. 660 [8 L.Ed.2d 758], involving narcotics addiction). Without this limitation, "it is difficult to see any limiting principle [to the protection against disproportionate punishment] that would serve to prevent this Court from becoming . . . the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country." (*Powell*, *supra*, 392 U.S. at p. 533.) Consequently, the constitutional protection against disproportionate punishment

cannot be a basis for requiring irresistible impulse as a test for the sanity of juvenile defendants.

As Justice Black noted in his concurring opinion to the plurality opinion in *Powell*, "the question whether an act is 'involuntary' is . . . an inherently elusive question, and one which the State may, for good reasons, wish to regard as irrelevant." (*Powell*, *supra*, 392 U.S. at p. 544.)  He further observed that finding the standard of irresistible impulse compelled under the prohibition against disproportionate punishments creates the classic slippery slope at the bottom of which the Supreme Court "would be forced to hold the States powerless to punish *any* conduct that could be shown to result from a 'compulsion' . . . .  The result, to choose just one illustration, would be to require recognition of 'irresistible impulse' as a complete defense to *any* crime" (*id*. at p. 544, italics added), pointing out that sex offenders also often act out of " 'compulsion' " (*id*. at p. 545).  Given that the majority of juvenile homicides seem to arise in the context of gang activity, we could easily foresee the mass exoneration of this antisocial behavior if a defense were available that the defendants could not help themselves under the pressure of their cohort to make use of guns against their victims.  We cannot countenance construing constitutional law to *mandate* such a result.  If not the threat of punishment, it is difficult to imagine what else society could do to restrain juveniles from criminal conduct.  It is precisely this balancing of policies that is a task more suited for the Legislature than this court.

Indeed, our own Supreme Court in the context of the execution of *mentally ill* defendants rejected any analogy to the prohibition as disproportionate of the execution of the *developmentally disabled*; "while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on *which* individuals fall within that category or precisely *where* the line of impairment should be drawn.  Thus, we are not prepared to

say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence.  We leave it to the Legislature . . . to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1252, italics added.)  If mental illness is not sufficient to forestall execution, a fortiori it is not sufficient to exculpate a juvenile from a conviction for homicide.

We consequently reject defendant's constitutional claim.  The trial court thus properly instructed the jury on the standard for finding defendant not guilty by reason of insanity.

**2.0     The 2016 Initiative Applies to Defendant**[*]

Before November 2016, former Welfare and Institutions Code, section 707, subdivision (d) (see Stats. 2015, ch. 234, § 2) authorized a prosecutor to dispense with the filing of a juvenile petition and instead directly file a criminal complaint against a minor 14 years of age or older in the superior court for certain offenses.  (*People v. Vela* (2017) 11 Cal.App.5th 68, 74, review granted July 12, 2017, S242298 (*Vela*).)  This is the route the prosecutor took in the present case in June 2013.  In an initiative effective November 9, 2016—while defendant's appeal was being briefed—the electorate repealed this provision of the statute.  Now, a prosecutor may file criminal charges against certain classes of minors *only* with the juvenile court's approval, after the court has considered factors listed in the statute at a transfer hearing.  (*Id*. at p. 72; *People v. Pineda* (2017) 14 Cal.App.5th 469, 478, petn. for review granted Dec. 13, 2017, S244451; Welf. & Inst. Code, § 707, subd. (a)(1).)  Defendant accordingly requested our permission to file a supplemental brief to argue that the requirement of a transfer hearing should be applied

---

[*]  See footnote, *ante*, page 1.

10

retroactively to his still pending case, and alternately that a failure to apply this procedure retroactively would violate his right to equal protection; we granted the request.

The issue, in the context of cases pending on appeal, is presently pending in the Supreme Court, with briefing only recently commencing. (*People v. Mendoza* (2017) 10 Cal.App.5th 327, review granted July 12, 2017, S241647.) As is its recent practice, the Supreme Court is granting review in all opinions that touch on this issue, published or unpublished. As a result, there is little purpose in our addressing the specifics of defendant's arguments to reinvent the wheel; even if he brought a new wrinkle to the analysis (which he does not), nothing we say is of any import until the case returns to us on remand to apply the ultimate holding in the lead case.

However, the Supreme Court has just issued its decision in *People v. Superior Court* (*Lara*) (2018) __ Cal.5th __ [2018 Cal. Lexis 726], which applies the requirement of a juvenile transfer hearing retroactively to a criminal proceeding pending *in the trial court*. It nonetheless cites *Vela*, *supra*, 11 Cal.App.5th 68, review granted, at length, and also approvingly discussed *Vela*'s remedy of a conditional reversal and limited remand for the purposes of holding a post hoc transfer hearing.

While this is not a holding directly applicable to the context of the present case, the import is clear. Although it could be argued that it is not even remotely probable that the juvenile court would find the present defendant suitable for juvenile court, the People do not object to a conditional reversal and remand for the juvenile court to rule on the issue. [END OF NONPUB. PT. 2.0]

## DISPOSITION

The judgment of the criminal court is conditionally reversed and the matter remanded to the juvenile court with direction to hold a juvenile transfer hearing to determine defendant's suitability for treatment in juvenile or criminal court within 90

days of the issuance of our remittitur. If the juvenile court determines that defendant is the proper subject of criminal proceedings, it shall reinstate the criminal judgment. If the juvenile court finds that it would *not* have transferred defendant to a court of criminal jurisdiction, then it shall deem defendant's convictions to be juvenile adjudications and conduct a dispositional hearing within its usual time frame. (*Vela*, *supra*, 11 Cal.App.5th at pp. 82-83, review granted.)

        BUTZ        , J.

We concur:

      BLEASE      , Acting P. J.

      MURRAY      , J.