Filed 11/17/17

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JEREMIAH CHARLIE BREWER,<br><br>    Defendant and Appellant. | F070564<br><br>(Super. Ct. No. F12904169)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part 4 of the Discussion, the Disposition, and the Concurring and Dissenting Opinion are certified for publication.

## INTRODUCTION

At the conclusion of a court trial, Jeremiah Charlie Brewer (defendant) was convicted of sexual penetration by force (Pen. Code, § 289, subd. (a)(1)(A); count 1), assault with intent to commit rape or forcible sexual penetration during the commission of first degree burglary (*id.*, § 220, subd. (b); count 2), and kidnapping to commit rape or forcible sexual penetration (*id.*, § 209, subd. (b)(1); count 3). The court found true allegations in count 1 that defendant substantially increased the risk of harm to the victim inherent in the offense by kidnapping her (*id.*, § 667.61, subds. (a), (d)(2)), committed the offense during the commission of first degree burglary with the intent of committing sexual penetration by force (*id.*, § 667.61, subds. (a), (d)(4)), and kidnapped the victim to accomplish the offense (*id.*, § 667.61, subds. (b), (e)(1)). Defendant was sentenced to an unstayed term of 25 years to life in prison.

In our original unpublished opinion, we held: (1) There was sufficient evidence defendant substantially increased the risk to the victim within the meaning of Penal Code sections 209, subdivision (b)(1), and 667.61, subdivision (d)(2) by moving her within her own apartment; (2) The fact the allegation under subdivision (d)(2) of section 667.61 of the Penal Code was found true does not require reversal of the true finding under section 667.61, subdivision (e)(1) of that code; and (3) Defendant's sentence does not constitute cruel and/or unusual punishment under the federal and state Constitutions, and his trial attorney was not ineffective for failing to object on that ground. Accordingly, we affirmed.

Defendant petitioned for rehearing, arguing that Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57 or the Act), enacted by the voters on November 8, 2016, applies retroactively to his case and requires a remand to the juvenile court system for further proceedings.[1] We granted rehearing to determine whether

---

**1** Unless otherwise specified, references to this enactment are to those portions of the Act applicable only to juvenile offenders.

defendant is entitled to relief under the Act.  In the published portion of this opinion, we conclude Proposition 57 does not apply retroactively to defendant's case.  In so holding, we reject claims the Act reduces the range of punishment for all juvenile offenders by giving the juvenile court exclusive jurisdiction over all juveniles, and creates a previously unavailable affirmative defense.  In the unpublished portion, we adhere to our original analysis and again find no error.  Accordingly, we again affirm.

## FACTS[*]

On February 10, 2012, Elizabeth F., a college student, lived in a first-floor apartment near California State University, Fresno.  The kitchen of the apartment adjoined the living room.  There was a window behind the kitchen sink, as well as windows near a sliding glass door in the living room.  At the time of events, the blinds to the window behind the sink were open, as were the blinds to the sliding door.  There was a public walkway outside the windows.  A person could look through the windows into the apartment from that walkway.

At 4:00 p.m., Elizabeth was alone in the apartment, washing dishes, when she looked up through the window behind the sink and saw a male passing by outside.  As the male walked by, he took a couple of steps back, looked through the window blinds, and kept going.  Elizabeth saw him a couple of minutes later by the windows near the living room.

The male, who had walked by twice, stopped the second time he passed by, looked back and forth a couple of times, and knocked on Elizabeth's door.  At first, Elizabeth thought it was the maintenance man, whom she had called about an hour earlier.  When she answered the door, however, defendant — the person who had walked by twice earlier — was standing there.

---

[*]     See footnote, *ante*, page 1.

Defendant asked Elizabeth if her husband was at home. She replied she was not married and asked if he was lost. Defendant said he was looking for his cousin and asked to use Elizabeth's phone. Elizabeth let defendant use her cell phone. Defendant stayed outside at first, but before he finished the call, he signaled that he wanted to enter. Elizabeth stepped back and defendant entered her apartment.

Inside Elizabeth's apartment, defendant handed back her cell phone. She asked defendant to walk out. Defendant turned away as though he was leaving, but slammed the apartment door shut. He immediately grabbed Elizabeth's shoulders and pushed her up against the wall, moving her 10 to 12 feet. Elizabeth asked defendant what he was doing and why. Defendant did not answer.

Elizabeth tried to fight defendant off. Defendant looked toward the window, then turned and saw Elizabeth's bedroom.[2] As Elizabeth struggled with him, defendant forced her to her bedroom. Elizabeth tried to yell, but defendant covered her mouth. He pushed Elizabeth onto the bed in her bedroom. Elizabeth kept telling defendant to stop and asked him why he was doing this. She also yelled for help. The windows and blinds in Elizabeth's bedroom were closed. Although the sliding door and windows in the living room area were open because Elizabeth had been mopping and wanted to air out her apartment, Elizabeth was farther away from the walkway and apartment entrance when in her bedroom than when in the living room.

Defendant pulled off Elizabeth's basketball shorts and underwear. Elizabeth became more frightened and tried yelling "Fire," but "it didn't come out" and so she yelled for defendant to stop. Defendant kept Elizabeth in place on the bed with one hand, while trying to remove his pants with the other. When he was unsuccessful, he

---

**2** Photographs depicting Elizabeth's bedroom, the hallway and bedroom, and the living room and entry door were admitted into evidence.

penetrated her vagina with his first two fingers past the second knuckle of the fingers for 15 to 20 seconds.

To get defendant to stop, Elizabeth told him a couple of times that her father was a cop. Then Elizabeth noticed the sound of the dishwasher and running water. She told defendant her boyfriend was in the shower. Elizabeth repeated this multiple times and told defendant her boyfriend was going to kill him. Defendant stopped, got up, and left through the front door. Elizabeth ran into her bathroom, locked the door, and called 911.

Fresno Police Officer Hansen was dispatched to Elizabeth's apartment immediately after the assault. Hansen took a statement from Elizabeth and described her emotional state as being "extremely upset." Elizabeth was crying the entire time. A sexual assault examination subsequently was performed. Elizabeth suffered bruises from the assault.

Hansen retrieved a phone number from Elizabeth's phone with an area code of 405, the Oklahoma City area. Detective Gray, who was assigned to the sexual assault unit, called the number and left a message. On March 6, 2012, Gray spoke to a woman named Malasia G., who said she lived in Oklahoma City. Malasia said she knew someone on Facebook who lived in Fresno named Jeremiah Brewer. Gray determined defendant lived in an apartment complex not far from Elizabeth. Shown a photographic lineup, Elizabeth identified defendant as her assailant.

Gray arrested defendant and brought him back to police headquarters for interrogation. Defendant was advised of and waived his constitutional rights. After initially denying he was involved in the assault, defendant admitted he came into Elizabeth's apartment and used her cell phone. Defendant said Elizabeth let him into the apartment. Defendant denied touching Elizabeth first. Defendant said Elizabeth "came on" to him and led him to the bedroom, and they lay on the bed together. Defendant denied forcible conduct or rape and said he touched her leg "and stuff like that." He also denied grabbing Elizabeth and dragging her into the bedroom.

Defendant initially denied that things got out of hand, but admitted Elizabeth apparently changed her mind and pushed him away. Defendant again denied raping Elizabeth and said he did not remember putting his fingers into her vagina. When he was asked if things changed after he placed his finger inside Elizabeth's vagina, defendant replied, "Yeah." Defendant admitted things got out of hand but continued to deny he raped Elizabeth and said he guessed she did not want him to place his fingers inside her vagina. Defendant wrote a letter apologizing to Elizabeth.

## DISCUSSION

1. **SUFFICIENCY OF EVIDENCE OF KIDNAPPING TO COMMIT SEX OFFENSE**[*]

### Introduction

Defendant contends there was insufficient evidence to: (1) support his conviction for kidnapping to commit forcible sexual penetration (Pen. Code, § 209, subd. (b)(1)); (2) support the trial court's true findings in count 1 that in committing sexual penetration by force he kidnapped the victim (*id.*, §§ 289, subd. (a)(1)(A), 667.61, subd. (e)(1)); and (3) establish he kidnapped the victim by employing movement that substantially increased the risk of harm to the victim (*id.*, § 667.61, subd. (d)(2)). Defendant argues any movement was only incidental to the commission of the underlying sexual offense and did not substantially increase the risk to the victim. We disagree.

### Legal Principles

When a defendant challenges the sufficiency of the evidence, appellate courts must review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. This standard of appellate review is the same whether the People primarily rely on direct or on circumstantial evidence. Although a jury must acquit if it

---

[*] See footnote, *ante*, page 1.

finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury, not the reviewing court, that weighs the evidence, resolves conflicting inferences, and determines whether the People have met the burden of establishing guilt beyond a reasonable doubt. If the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Casares* (2016) 62 Cal.4th 808, 823-824.) After reviewing the evidence in the light most favorable to the prosecution, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.)

Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) An appellate court must accept logical inferences that the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before a reviewing court can set aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

Penal Code section 209, subdivision (b) does not require, for an aggravated kidnapping, proof the movement of the victim *substantially* increased the risk of harm to the victim. It does, however, require proof the movement was more than merely incidental to the enumerated offense and increased the risk of harm above that inherent in said offense. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 978-982; see *People v. Vines* (2011) 51 Cal.4th 830, 869-871.)[3]

---

[3] Penal Code section 209, subdivision (b) provides: "(1) Any person who kidnaps or carries away any individual to commit robbery, rape, spousal rape, oral copulation,

7.

"The One Strike law, [Penal Code] section 667.61, requires a sentence of 25 years to life in prison whenever a defendant (1) is convicted of a current offense specified in subdivision (c), and (2) either 'one or more of the circumstances specified in subdivision (d)' or 'two or more of the circumstances specified in subdivision (e)' are present. ([Pen. Code,] § 667.61, subd. (a).)" (*People v. Hammer* (2003) 30 Cal.4th 756, 761, fns. & italics omitted.) The law requires a sentence of 15 years to life in prison whenever a defendant (1) is convicted of a current offense specified in subdivision (c), and (2) "one of the circumstances specified in subdivision (e)" is present. (Pen. Code, § 667.61, subd. (b).)

Sexual penetration, in violation of Penal Code section 289, subdivision (a), constitutes an offense specified in subdivision (c)(5) of Penal Code section 667.61. Penal Code section 667.61, subdivision (e)(1) incorporates by reference section 209 of the Penal Code, as it sets out the following circumstance applicable to the offenses specified in subdivision (c): "Except as provided in paragraph (2) of subdivision (d), the defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5." Penal Code section 667.61, subdivision (d)(2) sets out the following circumstance applicable to the offenses specified in subdivision (c): "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." Thus, subdivision (d)(2) of section 667.61 of the Penal Code requires a substantial increase of risk of harm from the defendant's asportation of the victim beyond that necessarily present in the underlying sexual offense.

---

sodomy, or any violation of Section 264.1, 288, or 289, shall be punished by imprisonment in the state prison for life with the possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

Any substantial asportation involving forcible control of the victim satisfies the risk of harm test. (*People v. Jones* (1997) 58 Cal.App.4th 693, 713.)

A seminal case from our Supreme Court relied on by defendant is *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*).[4] It held that aggravated kidnapping for robbery requires a movement of the victim that (1) is not merely incidental to the commission of robbery, and (2) substantially increases the risk of harm over and above what is present in the crime of robbery itself. (*Daniels*, *supra*, at p. 1139.) In *Daniels*, though there was a movement of some distance, it was inside a building and the court found the movement incidental. (*Id*. at p. 1140.)

In *People v. Rayford* (1994) 9 Cal.4th 1 (*Rayford*), the high court observed that in determining whether the movement was merely incidental to the crime—the first prong of the *Daniels* analysis—the trier of fact must consider the scope and nature of the movement. This includes the actual distance the victim is moved; however, there is no minimum number of feet a defendant must move a victim to satisfy this requirement. (*Rayford*, *supra*, at p. 12.) The court noted that in *Daniels*, the movement involved was merely incidental where, in the course of robbing and raping three women in their own homes, the defendants forced the victims to move about their rooms for distances of 18 feet, 5 or 6 feet, and 30 feet. (*Rayford*, *supra*, at p. 12; see *Daniels*, *supra*, 71 Cal.2d at pp. 1126, 1140.)

*Rayford* explained that the second prong of *Daniels* refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in the underlying offense. (*Rayford*, *supra*, 9 Cal.4th at p. 13.) "This

---

**4**      Prior to the Legislature's revision of Penal Code section 209, subdivision (b) in 1997, movement of the victim by the defendant had to be substantial. (See *People v. Vines*, *supra*, 51 Cal.4th at p. 869, fn. 20.) Several of the authorities we review analyze aggravated kidnapping pursuant to the statute as it existed prior to the 1997 revision. As these authorities address what constitutes a substantial increase in risk of harm, we find them persuasive in analyzing the One Strike law.

includes . . . such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.]" (*Id.* at pp. 13-14.) It also includes both the victim's desperate attempts to extricate himself or herself as well as unforeseen intervention by third parties. (*Id.* at p. 13.) That these dangers do not in fact materialize does not mean the risk of harm was not increased. (*Id.* at p. 14.)

The sexual assault victim in *Rayford* was forcibly moved 105 feet at night from the parking lot of a closed store to the other side of a wall located at the edge of the lot. She was forced to sit against the wall beside a small tree, 34 feet from the street. The wall, tree, and bushes at the end of the wall limited any chance the victim might be seen by passersby. An area beyond the wall bordered a two-lane street, but was undeveloped. Although there was some light, there was no evidence whether the victim and defendant were detectable from the street. (*Rayford*, *supra*, 9 Cal.4th at p. 23.) The court held this constituted sufficient evidence of asportation from which the jury could reasonably conclude the victim's forcible movement for this distance and under these circumstances was not merely incidental to the commission of attempted rape and substantially increased the victim's risk of harm. (*Ibid.*)

Several cases decided after *Rayford* have found an increased risk of harm to the victim of a sexual assault who was moved a short distance to a more secluded location within a building or to a space farther from public view. In *People v. Dominguez* (2006) 39 Cal.4th 1141, 1153, the defendant moved the victim in the middle of the night from the side of a road to a spot in an orchard 25 feet away and 10 to 12 feet down a steep hill. In *People v. Shadden* (2001) 93 Cal.App.4th 164, 167-170, the defendant moved the owner of a video store nine feet from a space behind the store counter to a back room where the defendant was able to close the door and keep the victim out of public view. In *People v. Diaz* (2000) 78 Cal.App.4th 243, 248-249, the defendant moved the victim from a well-lighted area on the sidewalk to the back of a recreation center, a location still

outdoors but more secluded from public view. In *People v. Jones* (1999) 75 Cal.App.4th 616, 628-630, the victim was moved by the defendant across a parking lot and pushed into her car where, although the car alarm was sounding, the victim was no longer in public view. In *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594, the defendant moved the victim 40 to 50 feet from a driveway open to a view from the street, into a camper. In *People v. Salazar* (1995) 33 Cal.App.4th 341, 344, 348, the victim was moved 29 feet from an outside walkway to the bathroom of a motel room, where the defendant closed the door. In each of these cases, the defendant's conduct was held to have caused increased risk of harm to the victim because of how and where the defendant moved the victim to commit a sexual assault.

"[E]ach case must be considered in the context of the totality of its circumstances." (*People v. Dominguez, supra,* 39 Cal.4th at p. 1152.) In the present case, Elizabeth's apartment was on the first floor of her apartment building. Elizabeth testified she was cleaning the common areas of her apartment with the window blinds open over the sink. The blinds for the sliding glass door were also open, as was the sliding glass door itself. From these windows and the door, anyone walking by Elizabeth's apartment could look in and view the kitchen and living room area. After entering the apartment, defendant slammed the apartment door shut, grabbed Elizabeth, and forced her, against her struggles, about 10 feet to the wall. He then looked toward the window because the blinds were open, turned and saw Elizabeth's bedroom, and forced Elizabeth to her bedroom. The windows and blinds in the bedroom were closed, and the bedroom was farther away from the walkway and entrance into the apartment than was the living room. Once in the bedroom, defendant began his sexual assault.

The facts in the instant action demonstrate defendant moved Elizabeth twice, the second movement leading her into a secluded room not visible from outside the apartment. This was more movement than necessary to effectuate the offense of digital penetration. The movement also significantly increased the risk of harm to Elizabeth. It

11.

greatly reduced the possibility a passerby would see defendant's assault or at least hear Elizabeth's cries for help.  The facts of this case are as strong as, if not stronger than, the facts found to show an increased risk of harm to the victims in *Rayford*, *Dominguez*, *Shadden*, *Diaz*, *Jones*, *Smith*, and *Salazar*.  We reject defendant's contention his movement of Elizabeth was only incidental to his sexual assault and did not pose a significantly greater risk of harm to her.

**2.     TRUE FINDINGS OF MULTIPLE SUBDIVISIONS OF PENAL CODE SECTION 667.61**[*]

Defendant contends the trial court's true findings under subdivisions (d)(2) and (e)(1) of Penal Code section 667.61 cannot both stand.  According to defendant, subdivision (e)(1) is expressly inapplicable where subdivision (d)(2) applies.  The People say the language of Penal Code section 667.61, subdivision (e)(1) is definitional and does not preclude an additional finding under subdivision (d)(2) of the statute.  We agree with the People that defendant reads subdivision (e)(1) too narrowly.

Subdivision (e)(1) of Penal Code section 667.61 states:  "Except as provided in paragraph (2) of subdivision (d), the defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5."  Defendant argues the express language of this subdivision "explicitly provides an exception where the kidnapping circumstance does not apply, that is, where the circumstance of subdivision (d)(2) applies."  According to defendant, the true finding under subdivision (d)(2) of Penal Code section 667.61 precludes a true finding pursuant to section (e)(1) of the same statute.

Penal Code section 667.61 is not a sentence enhancement; rather, it is an alternative and harsher sentencing scheme for the underlying specified sex crimes themselves.  (*People v. Acosta* (2002) 29 Cal.4th 105, 118.)  As we previously explained, subdivision (a) of Penal Code section 667.61 provides that if a defendant is convicted of

---

[*]      See footnote, *ante*, page 1.

12.

an offense enumerated in subdivision (c) of the statute under one or more of the circumstances specified in subdivision (d) of the statute or two or more of the circumstances specified in subdivision (e) of the statute, he or she is subject to a sentence of 25 years to life. Subdivision (b) of Penal Code section 667.61 provides for a sentence of 15 years to life if the defendant is convicted of an enumerated offense under one of the circumstances specified in subdivision (e) of the statute.

The introductory phrase of subdivision (e)(1) of Penal Code section 667.61 — "Except as provided in paragraph (2) of subdivision (d)" — is definitional language. As the People contend, it specifies the situation under which the circumstance applies, i.e., where the defendant kidnaps the victim in violation of section 207, 209, or 209.5 of the Penal Code, but does not substantially increase the risk of harm to the victim over and above the level of risk inherent in the underlying offense. It does not mean a true finding pursuant to Penal Code section 667.61, subdivision (d)(2) is precluded by subdivision (e)(1) or that a subdivision (e)(1) finding must be stricken where there is also a true finding under subdivision (d)(2). As the People accurately point out, subdivision (g) of Penal Code section 667.61 states: "Notwithstanding Section 1385 or any other provision of law, the court shall not strike any allegation, admission, or finding of any of the circumstances specified in subdivision (d) or (e) for any person who is subject to punishment under this section."

Where allegations are found true under both subdivisions (d)(2) and (e)(1) of section 667.61 of the Penal Code, subdivision (b) of the statute (which reads, in part, "[e]xcept as provided in subdivision (a)") precludes a sentence under that very same provision, and the defendant is sentenced pursuant to subdivision (a) of the statute. Here, the trial court sentenced defendant on count 1 pursuant to subdivision (a) of Penal Code section 667.61. The court properly followed the statutory sentencing scheme of Penal Code section 667.61, the sentence was authorized, and a true finding pursuant to subdivision (e)(1) of the statute was not precluded as argued by defendant.

13.

**3.      CRUEL AND/OR UNUSUAL PUNISHMENT**[*]

Defendant contends his sentence was cruel and/or unusual under the United States and California Constitutions because he was only 16 years old when he committed the offenses and he had no prior criminal record.  Defendant further asserts his trial counsel was ineffective for failing to challenge his sentence as cruel and/or unusual punishment.  We reject these arguments.

Defendant's Eighth Amendment challenge does not fall within the narrow proportionality principle in the Eighth Amendment reserved for extreme sentences that are grossly disproportionate to the offenses committed by the defendant.  (See *Ewing v. California* (2003) 538 U.S. 11, 20-21 (lead opn. of O'Connor, J.).)  Article 1, section 17 of the California Constitution sets forth three factors for courts to consider when analyzing whether a sentence is cruel or unusual:  (1) the degree of danger the offender and the offense pose to society; (2) how the punishment compares with punishments for more serious crimes; and (3) how the punishment compares for the same offense in other jurisdictions.  (*People v. Dillon* (1983) 34 Cal.3d 441, 479-482, disapproved on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186; *In re Lynch* (1972) 8 Cal.3d 410, 425-427 (*Lynch*).)

First, in *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1309, 1310, the court did not find a sentence of 195 years to life disproportionate, shocking, or inhumane for a violent sex offender who lacked a criminal history but who committed his crimes against young, vulnerable women; threatened his victims; and claimed an affiliation with law enforcement to avoid detection.  In *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474-1476, the court found a life term constitutional for a defendant who lacked a prior criminal record but who was convicted of torture and showed no remorse.  While perhaps not as serious as torture, residential burglary nevertheless is a serious offense that poses a

---

[*]      See footnote, *ante*, page 1.

14.

risk to human life, especially when it is perpetrated with the goal of committing a sexual assault. (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1281-1282 [concluding sentence of 25 years to life for forcible rape in course of burglary committed with intent to commit forcible rape is neither cruel nor unusual].)

Second, lengthy noncapital sentences have been upheld in a variety of sentencing scenarios. (See, e.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1230-1231 [upholding sentence of 135 years pursuant to One Strike law]; *People v. Crooks* (1997) 55 Cal.App.4th 797, 803-809 [mandatory minimum sentence of 25 years to life under One Strike law not cruel and/or unusual]; *People v. Cooper* (1996) 43 Cal.App.4th 815, 820-828 [sentence of 25 years to life under Three Strikes law for being ex-felon in possession of handgun not cruel and/or unusual]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666-667 [sentence of more than 283 years for multiple sex offenses constitutional].)

Third, how the punishment compares for the same offense in other jurisdictions — need not be reviewed under the facts of this case. (See *People v. Dillon*, *supra*, 34 Cal.3d at p. 487, fn. 38; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 846.) We note, however, that punishments for sex offenses in sister state jurisdictions include similar or harsher sentences. (See *People v. Estrada*, *supra*, 57 Cal.App.4th at p. 1282 [comparing sentences in Washington and Louisiana].)

In *Miller v. Alabama* (2012) 567 U.S. 460, 479-480 (*Miller*), the United States Supreme Court found an Eighth Amendment violation where a juvenile was subject to a mandatory sentence of life without the possibility of parole. The California Supreme Court reached a similar conclusion where a juvenile received a sentence of over 100 years for a noncapital offense, a span beyond the natural life expectancy of the offender. (*People v. Caballero* (2012) 55 Cal.4th 262, 266-269.) In *People v. Palafox* (2014) 231 Cal.App.4th 68, 73, 89-92 (*Palafox*), this court held a juvenile who committed homicide could be sentenced to life without the possibility of parole where the term imposed was

15.

not mandatory and the sentencing court properly evaluated all relevant sentencing criteria, including mitigating factors.

Defendant was 16 years old when he committed the instant offense. Unlike the defendants in *Miller* and *Palafox*, he did not receive a sentence of life without the possibility of parole. Rather, he received a sentence of 25 years to life and will be eligible for parole well within his natural life expectancy. The trial court did not abuse its sentencing discretion when it imposed an indeterminate sentence of 25 years to life on count 1.

Because defendant's sentence is not cruel and/or unusual, he cannot demonstrate either deficient performance by trial counsel or prejudice therefrom. Accordingly, his ineffective assistance of counsel claim fails. (See *People v. Maury*, *supra*, 30 Cal.4th at p. 389.)

### 4. PROPOSITION 57

We granted rehearing and asked the parties to submit supplemental briefing regarding whether Proposition 57 applies retroactively to defendant's case. Defendant argues Proposition 57 applies retroactively to all cases not yet final, pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). He says: "*Estrada*'s retroactivity presumption applies . . . for several reasons: reduction of punishment; creation of an affirmative defense[;] and retroactive application is consonant with [the Act's] stated purposes."

***Procedural Background and Proposition 57***

Historically, before a minor could be tried in criminal (adult) court, California required a finding the minor was unfit to be dealt with under the juvenile court law. (See, e.g., *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1493; *People v. Cardona* (2009) 177 Cal.App.4th 516, 523-524.) Although, prior to 1999, there were no provisions for the direct filing (mandatory or discretionary) of charges against juveniles in criminal court (*Juan G.*, *supra*, at p. 1493), a presumption of unfitness for minors, aged

16.

16 years old or older and charged with specified offenses, was added to the Welfare and Institutions Code[5] in 1979, and extended, in 1994, to minors between the ages of 14 and 16 who were alleged to have committed certain forms of murder (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680-681, fn. 1).

In 1999, the Legislature added subdivision (b) to section 602, mandating the direct filing in criminal (adult) court of criminal cases against minors 16 years of age or older under specified circumstances. (*Juan G. v. Superior Court*, *supra*, 209 Cal.App.4th at p. 1493.) In 2000, voters approved Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. In pertinent part, it "confer[red] upon prosecutors the discretion to bring specified charges against certain minors directly in criminal court, without a prior adjudication by the juvenile court that the minor is unfit for a disposition under the juvenile court law." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 545; see generally *id*., at pp. 548-550.) Proposition 21 also decreased, to 14, the minimum age for mandatory criminal prosecutions. (*Manduley*, *supra*, at p. 550.)

Elizabeth F. was sexually assaulted by defendant on February 10, 2012. Defendant was born October 13, 1995, making him 16 years old at the time of the crimes of which he was convicted. For unknown reasons, despite the provisions of former section 602, subdivision (b), mandating the direct filing of the accusatory pleading in criminal court, defendant's case proceeded by way of a juvenile wardship petition, filed March 9, 2012, under former section 602, subdivision (a).[6] The probation officer

---

**5** Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**6** At the time of defendant's offenses, former subdivision (b)(2)(E) of section 602 mandated prosecution in criminal (adult) court of juveniles 14 years of age or older who were alleged to have committed, inter alia, forcible sexual penetration (Pen. Code, § 289, subd. (a)), where it was alleged the minor personally committed the offense and where one of the circumstances enumerated in the One Strike law (Pen Code, § 667.61, subds. (d), (e)) was also alleged.

17.

recommended that defendant be found not a fit and proper subject to be dealt with under the juvenile court law.  On June 6, 2012, following a contested hearing, the juvenile court so found, and referred the matter to the district attorney for prosecution under the general law.

On June 8, 2012, charges were filed against defendant in criminal court.  He was convicted on September 2, 2014, and sentenced on October 29, 2014.  His notice of appeal was filed on November 26, 2014.  On November 8, 2016, while defendant's appeal was pending, voters enacted Proposition 57.  It went into effect the next day.  (Cal. Const., art. II, § 10, subd. (a).)  Insofar as we are concerned, the Act eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court.  The Act also removed the presumption of unfitness that previously attached to the alleged commission of certain offenses.[7]

The purpose of the portions of Proposition 57 that deal with juvenile offenders is to undo Proposition 21.  (See generally *People v. Marquez* (2017) 11 Cal.App.5th 816, 821, review granted July 26, 2017, S242660.)  Thus, two of the Act's stated purposes,

---

[7]     Section 602 now states:  "Except as provided in Section 707, any person who is under 18 years of age when he or she violates any law of this state . . . , is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

Section 707 now provides, in pertinent part:  "(a)(1) In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute . . . , the district attorney . . . may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction.  The motion must be made prior to the attachment of jeopardy.  Upon such motion, the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor. . . .  [¶]  (2) Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction.  In making its decision, the court shall consider [certain specified] criteria . . . ."  Subdivision (b) of section 707 extends subdivision (a) of the statute to any minor who allegedly committed a specified offense when he or she was 14 or 15 years of age.

contained in uncodified section 2 thereof, are to "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles," and "[r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141 (Voter Information Guide).)[8]

*Analysis*

There can be no doubt that, had defendant committed his offenses after Proposition 57 went into effect, he would have been entitled to a fitness hearing — with no presumption of unfitness — before his case could be transferred to criminal court for prosecution.[9] The question we confront is whether Proposition 57 applies to juvenile offenders who, like defendant, were charged, tried, convicted, and sentenced before the Act's effective date, but whose cases are not yet final on appeal. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 935 [for purpose of determining retroactive application of amendment to criminal statute, judgment is not final until time for petitioning for writ of certiorari in United States Supreme Court has passed].) This is a purely legal question we analyze de novo. (See *People v. Arroyo* (2016) 62 Cal.4th 589, 593.)[10]

---

[8]    The voter information guide is available at <http://voterguide.sos.ca.gov/en/propositions/57/> (as of Nov. 17, 2017).

[9]    We are not here faced with, and express no opinion concerning, the situation of a minor who was charged in adult court but not yet tried at the time the Act went into effect. (See *People v. Superior Court (Lara)* (2017) 9 Cal.App.5th 753, 758, 773-778, review granted May 17, 2017, S241231; see also *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288.)

[10]    This question is pending review before the state Supreme Court in numerous cases, including *People v. Superior Court (Walker)* (2017) 12 Cal.App.5th 687, review granted September 13, 2017, S243072; *People v. Marquez*, *supra*, 11 Cal.App.5th 816, rev.gr.; *People v. Vela* (2017) 11 Cal.App.5th 68, review granted July 12, 2017, S242298; *People v. Mendoza* (2017) 10 Cal.App.5th 327, review granted July 12, 2017, S241647; and *People v. Cervantes* (2017) 9 Cal.App.5th 569, review granted May 17, 2017, S241323.

Defendant says the provisions of Proposition 57 requiring a juvenile fitness/transfer hearing, and repealing the presumption of unfitness, apply to all cases not yet final. We disagree.

In ascertaining whether a statute should be applied retroactively, the intent of the electorate, or the Legislature, "is the 'paramount' consideration . . . ." (*People v. Nasalga* (1996) 12 Cal.4th 784, 792 (plur. opn. of Werdegar, J.); see *People v. Conley* (2016) 63 Cal.4th 646, 656.) " ' "In interpreting a voter initiative" ' such as Proposition [57], ' "we apply the same principles that govern statutory construction. [Citation.] Thus, . . . 'we turn first to the language of the statute, giving the words their ordinary meaning.' [Citation.] . . . The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] . . . When the language is ambiguous, 'we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet.' " ' [Citation.] 'In other words, our "task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent." ' [Citation.]" (*People v. Arroyo*, *supra*, 62 Cal.4th at p. 593.)

"It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise. [Citations.]" (*Tapia v. Superior Court*, *supra*, 53 Cal.3d at p. 287.) While the Welfare and Institutions Code does not contain a statutory codification of this principle (cf., e.g., Code Civ. Proc., § 3, Pen. Code, § 3), the California Supreme Court has made clear such statutory language " 'does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. [Citations.]' [Citation.]" (*Stenger v. Anderson* (1967) 66 Cal.2d 970, 977, fn. 13.)

The provisions of Proposition 57 affecting only juvenile offenders contain no express statement regarding retroactivity. Defendant seeks support for his claim of

20.

retroactive application in the fact the Act contains no savings clause; the specified purposes of the Act, quoted *ante*; uncodified section 5 of the Act, which says the Act "shall be broadly construed to accomplish its purposes" (Voter Information Guide, *supra*, text of Prop. 57, § 5, p. 145); and uncodified section 9 of the Act, which says the Act "shall be liberally construed to effectuate its purposes" (Voter Information Guide, *supra*, text of Prop. 57, § 9, p. 146). He says retroactivity furthers the goals of Proposition 57. Our Supreme Court, however, has "been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from 'vague phrases' [citation] and 'broad, general language' [citation] in statutes, initiative measures and ballot pamphlets." (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 229-230.) "Accordingly, we will not attempt to infer from the ambiguous general language of Proposition [57] whether the voters intended the measure to apply to . . . cases [that are not yet final]. Instead, we will employ the ordinary presumptions and rules of statutory construction commonly used to decide such matters when a statute is silent." (*Id.* at p. 230.)

" '[A] statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.' [Citations.]" (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841, quoting, inter alia, *INS v. St. Cyr* (2001) 533 U.S. 289, 320-321, fn. 45.) Defendant argues, however, that Proposition 57 falls within the exception to this general principle carved out by *Estrada*, *supra*, 63 Cal.2d 740.

*Estrada* dealt with a situation in which, at the time of Estrada's offense (escape without force or violence), the applicable statutes mandated a sentence of at least one year's imprisonment, to commence from the time the prisoner would have been discharged otherwise, with no grant of parole until service of at least two calendar years from the date of the escapee's return to prison after conviction. After Estrada committed the crime, but before his conviction and sentence, the statutes were amended to provide for a sentence of six months to five years in prison, with no minimum date for parole

eligibility. (*Estrada*, *supra*, 63 Cal.2d at pp. 743-744.)[11]  The California Supreme Court stated:

> "The problem, of course, is one of trying to ascertain the legislative intent — did the Legislature intend the old or new statute to apply?  Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional.  It has not done so.  We must, therefore, attempt to determine the legislative intent from other factors.

> "There is one consideration of paramount importance.  It leads inevitably to the conclusion that the Legislature must have intended, and by necessary implication provided, that the amendatory statute should prevail.  When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.  The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final.  This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at pp. 744-745.)

With respect to Penal Code section 3, the court stated:  "That section simply embodies the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively.  That rule of construction, however, is not a straitjacket.  Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent.  It is to be applied only after, considering all pertinent factors, it is determined that it is impossible

---

**11**     "Although parole constitutes a distinct phase from the underlying prison sentence, a period of parole following a prison term has generally been acknowledged as a form of punishment." (*People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

to ascertain the legislative intent. In the instant case there are . . . other factors that indicate the Legislature must have intended that the amendatory statute should operate in all cases not reduced to final judgment at the time of its passage." (*Estrada*, *supra*, 63 Cal.2d at p. 746.)

We conclude *Estrada* does not require that the provisions of Proposition 57 be applied retroactively to defendant's case. Although *Estrada* has been broadly applied in the past (see, e.g., *People v. Francis* (1969) 71 Cal.2d 66, 75-76 [applying *Estrada* to statutory amendment vesting in trial court discretion to impose either same penalty as under former law or lesser penalty]), the California Supreme Court has since made it clear *Estrada* "supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment *for a particular criminal offense*, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, italics added, fn. omitted (*Brown*).)

The state high court noted the "limited role *Estrada* properly plays in our jurisprudence of prospective versus retrospective operation" (*Brown*, *supra*, 54 Cal.4th at p. 324), and found *Estrada*'s statement about the rule of construction codified in Penal Code section 3 not being a "straitjacket" (*Estrada*, *supra*, 63 Cal.2d at p. 746), if applied broadly and literally, would "endanger the default rule of prospective operation" (*Brown*, *supra*, at p. 324). The court concluded: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in [Penal Code] section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment *for a particular criminal offense* is intended to apply to all nonfinal judgments. [Citation.]" (*Ibid.*, italics added.) The court rejected the argument *Estrada* should be understood to apply to any statute that reduced punishment in any manner, noting "the

23.

rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' [citation] . . . ." (*Brown*, *supra*, at p. 325, original italics.)

Brown concerned the application of a change in the rate at which prisoners in local custody could earn conduct credits (*Brown*, *supra*, 54 Cal.4th at pp. 317-318), a very different situation than we confront here. Nevertheless, we cannot just blithely write off, on that ground, a pronouncement by our state's highest court that limits the holding in one of that court's prior cases. That the state Supreme Court did not intend this limitation to apply only in the circumstances presented in *Brown* is clearly demonstrated by the fact it cited to a discussion of the default rule of prospective application, and rejection of a broad interpretation of *Estrada*, contained in *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208-1209, a civil case. (*Brown*, *supra*, at pp. 324-325.) The Supreme Court's application of the limitation on *Estrada* in two such disparate scenarios strongly signals its intent that said limitation should be broadly applied. This is especially so when we take into account that court's more recent reference to *Brown* as "acknowledging the continuing viability of the *Estrada* rule, [but] emphasiz[ing] its narrowness . . . ." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1196, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

We recognize significant differences exist between juvenile and adult offender laws, and that "[t]he former seeks to rehabilitate, while the latter seeks to punish." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.) We also recognize "the certification of a juvenile offender to an adult court has been . . . characterized as 'the worst punishment the juvenile system is empowered to inflict.' [Citation.]" (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810.) Proposition 57 has the potential to reduce the range of permissible punishment — including that applicable to the offenses of which defendant was convicted — for a class of offenders. Nevertheless, no provision of Proposition 57

24.

mitigates the penalty for a particular criminal offense.  Accordingly, *Estrada* does not overcome the strong presumption of prospective-only application.

Defendant argues the Act reduces the range of punishment for juvenile offenses that previously were subject to direct filing in criminal court by giving juvenile courts "exclusive" jurisdiction over all juveniles.  To the contrary, "[t]he juvenile court and the criminal court are divisions of the superior court, which has subject matter jurisdiction over criminal matters and civil matters, including juvenile proceedings.  (See Cal. Const., art. VI, § 10.)  When exercising the jurisdiction conferred by the juvenile court law, the superior court is designated as the juvenile court.  (. . . § 245.)  Accordingly, when we refer . . . to the jurisdiction of the juvenile court or the jurisdiction of the criminal court, we do not refer to subject matter jurisdiction, but rather to the statutory authority of the particular division of the superior court, in a given case, to proceed under the juvenile court law or the law generally applicable in criminal actions.  [Citation.]" (*Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 548, fn. 3; see *People v. Cardona*, *supra*, 177 Cal.App.4th at p. 527.)  As to crimes that qualify a juvenile offender for transfer to adult court, such as those committed by defendant (§ 707, subd. (a)(1)), subject matter jurisdiction is concurrent between the criminal division and the juvenile division.  (See *Manduley*, *supra*, at p. 562.)

As previously noted, the portions of Proposition 57 applicable only to juvenile offenders contain no express retroactivity provision.  By contrast, the Act expressly renders the provisions relating to eligibility for parole consideration retroactive by making them applicable to "[a]ny person convicted . . . and sentenced . . . ." (Cal. Const., art. I, § 32, subd. (a)(1); see *People v. Franklin* (2016) 63 Cal.4th 261, 278 [discussing retroactivity of youth offender parole hearings under Pen. Code, § 3051].)  Moreover, section 707, subdivision (a)(1), as amended by the Act, mandates that any motion to transfer the minor from juvenile court to criminal court "*must* be made *prior to the attachment of jeopardy*." (Italics added.)

25.

"The voters are presumed to have been aware of existing law at the time an initiative was enacted. [Citations.]" (*Juan G. v. Superior Court*, *supra*, 209 Cal.App.4th at p. 1494.) In addition, we generally assume voters considered the entire text of a proposal submitted to them for enactment. (See *People v. Valencia* (2017) 3 Cal.5th 347, 369.) This being the case, logic dictates that had voters intended the juvenile offender provisions of Proposition 57 to apply to such offenders who were already tried, convicted, and sentenced, the enactment would have included an express provision to that effect, as did the parole eligibility portions of the Act.

When interpreting a legislative enactment, " '[w]e must . . . avoid a construction that would produce absurd consequences, which we presume the Legislature [or voters] did not intend. [Citations.]' [Citation.]" (*In re Greg F.* (2012) 55 Cal.4th 393, 406; see *People v. Union Pacific Railroad Co.* (2006) 141 Cal.App.4th 1228, 1257 & fn. 5.) To hold Proposition 57 applies retroactively to defendants who have been convicted and sentenced, but whose judgments are not yet final, would mean an offender who was tried and convicted by a jury of special circumstance murder upon proof beyond a reasonable doubt, and sentenced to life in prison without the possibility of parole by a court that carefully considered whether to impose a lesser term of 25 years to life as permitted by Penal Code section 190.5, subdivision (b), would be given the opportunity of being released within a matter of a few years (see, e.g., §§ 607, 1769, 1771). This is so even though the life-without-parole sentence comported with the Eighth Amendment to the United States Constitution, as construed in *Miller v. Alabama* (2012) 567 U.S. 460 and *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718]. It is difficult to imagine a more absurd result, or that voters intended for such an offender to be returned to society within such a short time.

Defendant asserts, however, that Proposition 57 applies retroactively because it "creates an affirmative defense that was unavailable at the time of the denial of [defendant's] petition to be adjudged in juvenile court and at the time of his criminal

adult trial. Specifically, had Proposition 57 been in effect, the judge would have acted in excess of its jurisdiction by denying [defendant's] petition and referring him to adult criminal court because Proposition 57 changed the rules of the game in [defendant's] favor. And those rules would likely have tipped the scales in favor of [defendant] remaining in the juvenile court system where he would not have been a criminal sent to prison but subject to rehabilitation measures by the juvenile court if found to have committed the charged offenses." Defendant points to the increase, under the Act, in prosecutorial discretion whether to seek to try a juvenile as an adult, as well as the factors to be weighed by a juvenile court in evaluating whether transfer from a juvenile court to an adult court is appropriate.

It is true that new defenses generally are given retroactive application. (See, e.g., *People v. Wright* (2006) 40 Cal.4th 81, 95-96; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785-786; *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1544-1545.) In our view, defendant does not establish the Act created a true defense. Rather, he argues, based on his own personal circumstances, that "Proposition 57 significantly increased the likelihood [defendant's] case would be handled in juvenile court and he would thereby receive a less severe sentence and no criminal record or status." We reject defendant's reasoning. "Whether or not the [electorate] intended the [enactment] to be retroactive to cases not final before the effective date [thereof] obviously cannot be decided on the basis of the particular facts of this or any other individual case." (*People v. Francis*, *supra*, 71 Cal.2d at pp. 76-77.)

Defendant also argues that if his fitness hearing had been conducted pursuant to the Act, the juvenile court's ruling would have been in excess of its jurisdiction, because defendant was not afforded the right to have (1) the prosecutor exercise discretion in determining whether defendant's was a case that merited a petition for transfer to adult court, (2) a hearing without a presumption of unfitness, and (3) a hearing in which the prosecution, not defendant, bore the burden of proof on the question of fitness. This

27.

argument is valid only if Proposition 57 applies retroactively. We have held it does not. Nor, in our view, do the changes in the law occasioned by the Act require a finding of retroactivity when, as we have concluded, voters did not intend retroactive application.

"[T]here is no express constitutional guarantee giving a minor the right to trial in juvenile court, let alone affording him a presumption of fitness for trial in juvenile court. Nor is there authority establishing the rebuttable presumption [of unfitness] impacts a fundamental right implicitly guaranteed by the Constitution. [Citation.]" (*Hicks v. Superior Court* (1995) 36 Cal.App.4th 1649, 1658, fn. omitted; see *Manduley v. Superior Court*, *supra*, 27 Cal.4th at pp. 564-565; see generally *In re Gault* (1967) 387 U.S. 1, 14-17 [describing genesis and development of juvenile court system].) "The sole purpose of the fitness hearing is to determine whether the best interest of the minor and of society will be served by retention in the juvenile court or whether the minor should be tried as an adult. [Citation.]" (*People v. Superior Court (Ronald H.)* (1990) 219 Cal.App.3d 1475, 1479.) The type of penalty that may be imposed upon conviction as an adult is irrelevant to the determination of a minor's amenability to treatment within the juvenile system (*ibid*.), as is guilt or innocence (*Rene C. v. Superior Court* (2006) 138 Cal.App.4th 1, 10).

This being the case, neither removal of the presumption of unfitness nor alteration of the burden of proof as to fitness implicates the federal Constitution. Neither change alters the elements of the crime(s) charged nor the requirement that the prosecution prove guilt beyond a reasonable doubt. Neither denies a juvenile offender his or her rights to notice of charges, to counsel, to confront and cross-examine witnesses, nor to the privilege against self-incrimination. (See *Marcus W. v. Superior Court* (2002) 98 Cal.App.4th 36, 41.)

Defendant insists that, because the juvenile court's actions would have been in excess of its jurisdiction had the fitness hearing proceeded under Proposition 57, failing to apply the Act retroactively would deny defendant his right to the affirmative defense of

28.

the lower court acting in excess of its jurisdiction, which in turn would deny him due process under the federal Constitution.  As support, defendant cites *Kent v. United States* (1966) 383 U.S. 541 (*Kent*).

*Kent* concerned a District of Columbia law that permitted the juvenile court to waive its jurisdiction " 'after full investigation' " and order certain specified juvenile offenders held for trial in regular criminal court, but which did not state standards to govern the juvenile court's waiver decision.  (*Kent*, *supra*, 383 U.S. at pp. 547-548.) Kent's attorney requested a hearing on the question of waiver, offered to prove Kent was a suitable subject for rehabilitation in the juvenile court system, and asked for access to the social service file compiled by juvenile court staff during Kent's prior probation period that would be available to the juvenile court judge for consideration on the waiver question.  The juvenile court judge did not rule on any of the motions, hold a hearing, or confer with Kent, Kent's parents, or Kent's counsel.  He simply entered an order reciting that after " 'full investigation,' " he waived jurisdiction.  He made no findings and recited no reasons for the waiver, although the high court assumed that, prior to entry of the order, the judge received and considered recommendations of the juvenile court staff, the social service file relating to Kent, and a juvenile probation report.  (*Id*. at pp. 545-547.) Kent ultimately was convicted of multiple felonies in criminal court and sentenced to a lengthy prison term, some of which was to be spent in a psychiatric facility in light of the jury's finding of insanity on one of the charges.  (*Id*. at p. 550.)

The United States Supreme Court held the order of the juvenile court, waiving its jurisdiction and transferring Kent for trial in adult court, was invalid.  (*Kent*, *supra*, 383 U.S. at p. 552.)  The court stated:  "[T]he statute contemplates that the Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction over a child or — subject to the statutory delimitation — should waive jurisdiction.  But this latitude is not complete.  At the outset, it assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of

due process and fairness, as well as compliance with the statutory requirement of a 'full investigation.' [Citation.] The statute gives the Juvenile Court a substantial degree of discretion as to the factual considerations to be evaluated, the weight to be given them and the conclusion to be reached. It does not confer upon the Juvenile Court a license for arbitrary procedure. The statute does not permit the Juvenile Court to determine in isolation and without the participation or any representation of the child the 'critically important' question whether a child will be deprived of the special protections and provisions of the Juvenile Court Act." (*Id*. at pp. 552-553, fns. omitted.)

The high court found it "clear beyond dispute" that the waiver of the juvenile court's jurisdiction was "a 'critically important' action determining vitally important statutory rights of the juvenile," as the statutory scheme vested the juvenile court "with 'original and exclusive jurisdiction' of the child." (*Kent*, *supra*, 383 U.S. at p. 556.) The court stated: "The net, therefore, is that [Kent] — then a boy of 16 — was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the 'exclusive' jurisdiction of the Juvenile Court. In these circumstances, considering particularly that decision as to waiver of jurisdiction and transfer of the matter to the [adult] [c]ourt was potentially as important to [Kent] as the difference between five years' confinement and a death sentence, we conclude that, as a condition to a valid waiver order, [Kent] was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel." (*Id*. at p. 557.)

As we have explained, California's juvenile court law, unlike the statutory scheme at issue in *Kent*, does not confer exclusive jurisdiction on the juvenile court. More importantly, defendant received that which due process required at the time of his fitness hearing. (See *Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 562.) "*Kent* . . . held

30.

only that where a statute confers a right to a *judicial* determination of fitness for a juvenile court disposition, the due process clause requires that the determination be made in compliance with the basic procedural protections afforded to similar judicial determinations." (*Manduley*, *supra*, at p. 566.) That the procedure for determining where a juvenile offender should be tried has been changed by Proposition 57 to require a judicial determination of unfitness in all circumstances does not mean the new procedure applies retroactively to cases in which the offender has already been convicted, or that failure to so apply it denies the offender an affirmative defense, impinges on a liberty interest, or violates due process. *Kent* does not hold to the contrary.[12]

## DISPOSITION

The judgment is affirmed.

_____

DETJEN, J.

I CONCUR:


_____

HILL, P.J.

---

[12]    In *Tapia v. Superior Court*, *supra*, 53 Cal.3d 282, the California Supreme Court addressed application of the provisions of Proposition 115. In pertinent part, it held that provisions adding intent requirements to certain special circumstances permissibly could be applied to *trials* of crimes committed before the proposition's operative date, because, although they changed the legal consequences of a defendant's criminal conduct, they did so in a way that benefited defendants. (*Tapia*, *supra*, at pp. 300-301.) The *Tapia* opinion says nothing about application of the new provisions to cases in which trial was already held.

**SMITH, J., Concurring and Dissenting – Published**

I concur with the majority in sections 1, 2, and 3, which comprise the unpublished portion of this opinion. I dissent from section 4 of the majority opinion, which addresses the question of whether Proposition 57 applies prospectively only or also retroactively to cases such as this one, which were pending final judgment on its effective date. The majority has determined that Proposition 57 applies prospectively only. I believe the better argument is that the electorate intended the amendments effected by Proposition 57 also to apply retroactively, to cases that were not final at the time of the proposition's enactment. Accordingly, I would apply Proposition 57 retroactively here. In turn, I would conditionally reverse the judgment and remand the matter for the juvenile court to conduct a new fitness hearing, pursuant to Welfare and Institutions Code sections 602 and 707, as amended by Proposition 57.[1]

Although there is a general presumption that new laws apply prospectively, *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287, I conclude that Proposition 57 is subject to the exception to that presumption articulated in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). In *Estrada,* our Supreme Court held: "When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted (*Brown*).) *Brown* explained that *Estrada* "articulate[d] the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, *supra*, at p. 324; *People v. Conley* (2016) 63 Cal.4th 646, 656

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

(*Conley*) [*Estrada* "held that new laws that reduce the punishment for a crime are presumptively to be applied to defendants whose judgments are not yet final"].)

Estrada's rationale is based on the principle that, "'[o]rdinarily,' … 'when an amendment lessens the punishment for a crime one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest.'" (*People v. Nasalga* (1996) 12 Cal.4th 784, 791 (*Nasalga*).) *Estrada* explained: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.…  [T]o hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology."  (*Estrada*, *supra,* 63 Cal.2d at p. 745; see *Conley*, *supra,* 63 Cal.4th at p. 656 ["when the Legislature determines that a lesser punishment suffices for a criminal act, there is ordinarily no reason to continue imposing the more severe penalty beyond simply "'satisfy[ing] a desire for vengeance"'"].)  In short, "*Estrada* stands for the proposition that, 'where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.'" (*Nasalga*, *supra*, 12 Cal.4th at p. 792.)

The majority contends that any finding that Proposition 57 has retroactive application is foreclosed by *Brown*, notwithstanding the fact that *Brown* addressed a very different type of statute.  *Brown* appeared to emphasize that the *Estrada* rule applies only when an amendatory statute reduces the penalty *for a particular crime.*  (*Brown*, *supra*, 54 Cal.4th at p. 324.)  The majority reasons that because Proposition 57 does not directly reduce the penalty for any particular crime, it is not retroactive under *Estrada* and *Brown*.

2.

*Brown*, however, considered the question whether a statute temporarily (i.e., for just an eight-month period) increasing good behavior credits for prisoners *after* sentencing, amounted to a reduction in punishment under *Estrada.* (*Brown*, *supra*, 54 Cal.4th at pp. 317, 323-324.) The statute at issue in *Brown* had nothing to do with the punishment or actual sentence facing a defendant for committing a crime. (*Id.* at p. 325, italics added ["Instead of addressing *punishment for past criminal conduct*, the statute addresses *future conduct* in a custodial setting by providing increased incentives for good behavior."].) Indeed, the statute was enacted as a temporary response to a state "fiscal crisis," and in no way reflected a legislative judgment that certain offenses were erstwhile punished too severely. (*Ibid.* [a statute increasing conduct credits for good behavior after imposition of sentence "does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent"].)

Proposition 57, on the contrary, expressly aims to facilitate rehabilitative dispositions for minors, based on past criminal conduct, with respect to a limited subset of the most serious crimes (i.e., the crimes for which minors are subject to prosecution in adult criminal court). (See Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141[2] [Proposition 57 was intended to "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles" by "[r]equir[ing] a judge, not a prosecutor, to decide whether juveniles should be tried in adult court."]; see *id*., argument in favor of Prop. 57, p. 58 ["Prop. 57 focuses on evidence-based rehabilitation" by allowing "a judge to decide whether or not a minor should be prosecuted as an adult."].) In order to achieve its stated goal of facilitating rehabilitation, Proposition 57, abolishes the prosecution's ability directly to file criminal charges against minors in adult court,

---

[2]     The Voter Information Guide is available at <http://www.sos.ca.gov/elections/voting-resources/voter-information-guides/> [as of Nov. 17, 2017].

3.

and erases any presumption of unfitness of a minor for purposes of juvenile court jurisdiction over his or her matter. (See, e.g., *People v. Superior Court* (*Walker*) (2017) 12 Cal.App.5th 687, 696, review granted Sept. 13, 2017, S243072.) All cases against minors are now required to be filed in juvenile court and, in order to move the case to adult court, the prosecution must bring a transfer motion, whereby it, as the proponent of the motion, shoulders the burden of showing the minor is unfit for the jurisdiction of the juvenile court. (§ 707, subd. (a)(1) & (2); Evid. Code, §§ 500, 550.)

Under Proposition 57, it undeniably is harder to prosecute minors in adult court. It follows that Proposition 57 militates against imposition of the maximum punishment for the underlying subset of crimes for which minors can be prosecuted in adult court. (See *People v. Pineda* (2017) 14 Cal.App.5th 469, 482, fn. 9 (*Pineda*) [Proposition 57 provides for "reductions in punishment for a host of penal statues without need of going to the trouble of enumerating them all."].) Our Supreme Court has recognized, "[transferring] a juvenile offender to an adult court has been accurately characterized as 'the *worst punishment* the juvenile system is empowered to inflict.'" (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810, italics added.)[3] The fact that Proposition 57 makes it more difficult to prosecute minors for specific crimes in adult court, reflects a determination by the voters that minors committing these crimes were, in some instances, punished too severely. (See *Pineda*, *supra*, at p. 483, italics added ["the voters … determined criminal punishment for juvenile offenders may be too severe in some cases, namely, those where a judge *declines* to order the transfer of an offender to a court of criminal jurisdiction—an adjudicatory forum in which there is a greater focus on punishment instead of rehabilitation and greater latitude to impose substantially longer custodial sentences"].) The voters' underlying determination that some minors were

---

**3**    See *People v. Macias* (1997) 16 Cal.4th 739, 750; *Marcus W. v. Superior Court* (2002) 98 Cal.App.4th 36, 41.

erstwhile punished too severely, leads to the "inevitable inference" that the voters intended to extend the opportunity to obtain a rehabilitative disposition under Proposition 57 as broadly as possible. (*Estrada*, *supra,* 63 Cal.2d at p. 745; see *Conley, supra*, 63 Cal.4th at p. 656 [the *Estrada* rule creates a "presumption about legislative intent" with regard to the retroactivity of the amendment at issue].)

Furthermore, the voters approved Proposition 57 in the midst of a "sea change" in "penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders." (*People v. Vela* (2017) 11 Cal.App.5th 68, 75, review granted Jul. 12, 2017, S242298 (*Vela*).) Courts and legislatures have acted decisively, in recent years, to limit application of the harshest punishments to minors. (See, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67 [barring LWOP sentences for minors convicted of nonhomicide offenses]; *Miller v. Alabama* (2012) 567 U.S. 460 [barring mandatory LWOP sentences for minors convicted of homicide offenses and requiring consideration of youth-related factors as mitigation at sentencing]; Sen. Bill No. 260 (2013-2014 Reg. Sess.) adding § 3051 to the Penal Code [§ 3051 recognizes the "diminished culpability of juveniles" and provides for mandatory "youth offender parole hearings" for eligible juvenile defendants].) The fact that Proposition 57 was enacted at a time of increased recognition of the "[diminished] culpability and [unique] rehabilitation possibilities" of minors, supports the inference that the voters had determined that the specific crimes at issue were sometimes punished too severely in the case of minors. (*Vela*, *supra*, at p. 75.)

In light of Proposition 57's emphasis on rehabilitative dispositions for minors and its potential ameliorative effects on punishment for past criminal conduct, it warrants application of the *Estrada* exception, whereas the statute at issue in *Brown*, correctly, did not.[4] (See *People v. Francis* (1969) 71 Cal.2d 66, 79 [a *potentially* favorable

---

[4]    It bears mention that when our Supreme Court recently considered the question of retroactivity of Proposition 36 in *Conley*, it did not hold that application of the *Estrada* rule was strictly limited to situations where an amendatory statute reduces the penalty for

amendment, in terms of the discretionary punishment faced by a defendant, is subject to the *Estrada* rule]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 69-70 [accord].) I therefore disagree with the majority's view that Proposition 57 is inapplicable to cases that were pending final judgment on its effective date.

The majority posits that applying Proposition 57 retroactively would lead to "absurd results," in that even a hypothetical minor convicted of, and sentenced for, "special circumstance murder" in adult court, would thereby be entitled to a conditional remand for a fitness hearing and the opportunity for a rehabilitative disposition if the judgment in his case were not yet final. (Maj. opn., *ante*, at p. 26.) The majority's concern about "absurd results" is belied by Proposition 57's stated goal: to facilitate the rehabilitation of minors who have committed the most serious crimes. In light of Proposition 57's emphasis on rehabilitation, extending the *opportunity* to obtain a rehabilitative outcome as broadly as possible is far from an "absurd result." On the contrary, it gives effect to the voters' determination that specific crimes, in some instances, previously were punished too severely in the case of minors.

In support of its holding that Proposition 57 is not retroactive, the majority next contrasts Proposition 57's amendments relating to juveniles with a separate provision relating to parole eligibility. (Maj. opn., *ante*, at p. 25.) Specifically, the majority states that the "portions of Proposition 57 applicable only to juvenile offenders contain no express retroactivity provision" but "the provisions relating to eligibility for parole consideration" are made "expressly" retroactive "by making them applicable to '[a]ny person convicted … and sentenced.'" (Maj. opn., *ante*, at p. 25.) The majority's assertion is puzzling because the provision concerning parole eligibility does *not* contain any "express" indication of retroactivity. The provision states: "Any person convicted of

a particular crime, but rather analyzed the application of the *Estrada* rule to Proposition 36 on other grounds. (See *Conley*, *supra*, 63 Cal.4th 646.)

a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 32, p. 141.) This language simply reflects the nature of parole, specifically the fact that, in order to be eligible for parole consideration, a person must first be "convicted … and sentenced." The majority's suggestion that this language "expressly" renders the provision retroactive is misleading.

Finally, the majority believes that the fact that Proposition 57 "mandates that any motion to transfer the minor from juvenile court to criminal court 'must be made prior to the attachment of jeopardy,'" suggests an intent for Proposition 57 to apply prospectively only. (Maj. opn., *ante*, at p. 26, italics omitted.) However, a conditional reversal and remand of a pending case for a fitness hearing under Proposition 57—as the *Vela* court ordered in that matter—obviates any concerns about the attachment of jeopardy. Assuming it is a foregone conclusion that the prosecution would file a motion for a fitness hearing on remand, "[r]eversal of the judgment effectively operates to vitiate the prior attachment of jeopardy." (*Pineda*, *supra*, 14 Cal.App.5th at p. 483, fn. 10; see *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1494 ["voters are presumed to have been aware of existing law at the time an initiative was enacted"].) Accordingly, I see no impediment to applying Proposition 57 retroactively to this case.

Pivoting to the specific facts at issue here, it appears that retroactive application of Proposition 57 may well result in a rehabilitative disposition for Brewer. As the majority notes, this matter was initiated in juvenile court and the juvenile court subsequently conducted a fitness hearing under the prior law. Applying a presumption of unfitness against Brewer, pursuant to *former* section 707, subdivision (c), the juvenile court concluded that Brewer was unfit for treatment under the juvenile court law and referred the case for prosecution in adult court. (See *Rene C. v. Superior Court* (2006) 138 Cal.App.4th 1, 10 (*Rene C.*) [Under former § 707, subd. (c), "the minor who is presumed

to be unfit has the burden of rebutting the presumption by a preponderance of the evidence."].)

More specifically, at Brewer's initial fitness hearing, the court evaluated his fitness under the five factors specified in former section 707, subdivision (c).[5] It was undisputed that Brewer had limited or no prior delinquency history, had not been subject to prior attempts at rehabilitation under the jurisdiction of the juvenile court, and could be rehabilitated within the timeframe applicable to a juvenile disposition. The court accordingly found Brewer fit under these three factors. In relation to the remaining two factors, namely, the minor's degree of criminal sophistication, and the circumstances and gravity of the alleged offenses, the court narrowly found Brewer to be unfit, after applying a presumption of unfitness in making its determination. The court observed, as to both the latter factors, that making the requisite determination was "difficult," in light of "evidence of mitigation" pertaining to Brewer's "lack of impulse control or lack of judgment."[6] (See former § 707, subd. (c)(1)(b) & (5)(B); *Rene C.*, *supra*, 138 Cal.App.4th at p. 12.) Further, with regard to the factor of criminal sophistication, the court noted that while the offense reflected "a degree of criminal sophistication," it was

---

[5] The five factors were: the minor's prior delinquent history; the success of prior attempts to rehabilitate the minor; the minor's ability to be rehabilitated before the juvenile court's jurisdiction expires; the minor's degree of criminal sophistication; and the circumstances and gravity of the crimes alleged against the minor. (See *Rene C.*, *supra*, 138 Cal.App.4th at p. 10.) Further, under former section 707, subdivision (c), in order to qualify for juvenile court treatment, the court had to find that the minor was "fit" under each of the five factors. (*Rene C.*, *supra*, at p. 10.) The court was also permitted to consider "extenuating or mitigating circumstances in evaluating each of the [five] criteria." (Former § 707, subd. (c).)

[6] As the court acknowledged, the defense had presented relatively strong mitigating evidence related to Brewer's mental health at the time. Brewer was tentatively diagnosed with bipolar disorder and, for reasons outside his control, had been off his antipsychotic medication (Risperdal) for quite some time. Brewer's expert witness, a psychologist, opined that, "had [Brewer] been on the medication, [it] is doubtful [the crime] would ever have occurred."

"clearly not one of great criminal sophistication." The court ultimately concluded, based on its findings under two of the five applicable factors, that Brewer had not overcome the presumption of unfitness under section 707, subdivision (c), and referred the matter for prosecution in adult court.

With the repeal of former section 707, subdivision (c) by Proposition 57, any presumption of unfitness is erased, the burden of proving unfitness rests with the prosecution, and the court has more flexibility in making the ultimate determination of fitness or unfitness.[7] As discussed above, in comparison with the prior law, these changes militate in the affected minor's favor. In Brewer's case, the question of fitness or unfitness was a close one even under the less-favorable prior law, making it distinctly possible that, at any new fitness hearing under the amended law, the juvenile court would reverse its earlier determination.

In sum, I disagree with the majority's view that Proposition 57 is inapplicable to cases that were pending final judgment on its effective date. As in *Vela*, I would conditionally reverse the instant judgment in order to permit the juvenile court to conduct a new fitness hearing pursuant to sections 602 and 707, as amended by Proposition 57. Were the trial court to find that Brewer is unfit for a juvenile adjudication, the judgment would be reinstated. If, on the other hand, the juvenile court were to find that it would not have transferred Brewer to adult court in the first instance, his conviction and enhancements would be deemed juvenile adjudications and the juvenile court would impose an appropriate disposition under juvenile law. (See *Vela*, 11 Cal.App.5th at pp. 81-82.)

_____

Smith, J.

---

**7** Former section 707, subdivision (c) specified that, with respect to certain offenses, in order to find a minor fit for juvenile court jurisdiction, the court had to find him fit under each of the five applicable factors.

9.